IN RE GUS A. JUGENHEIMER.
IN RE GLEN JOHNSON.

FILED JUNE 4, 1908.   Nos. 15,357, 15,358.

1. **Intoxicating Liquors: LICENSE: DISCRETION OF BOARD.** The excise board of a city is vested with a wide discretion in the matter of granting licenses for the sale of intoxicating liquors.

2. ———: ———: ———. Such discretion extends to limiting the number of licenses which it will issue for the sale of liquors within the city, as well as the number that will be granted for any particular locality.

3. ———: ———: ———. This is especially true where, as in the city of Lincoln, the board is charged with policing the city and maintaining peace and good order therein, but is limited in the number of officers which it may appoint and maintain for this purpose.

APPEAL from the district court for Lancaster county: EDWARD P. HOLMES, JUDGE. *Judgment of district court reversed: Order of excise board affirmed.*

*John M. Stewart* and *T. F. A. Williams,* for appellants.

*Edwin Murfin* and *T. J. Doyle, contra.*

DUFFIE, C.

The records in the cases above entitled disclose the following facts: June 4, 1907, Jugenheimer filed with the

excise board of the city of Lincoln his application for license to sell intoxicating liquors at No. 1119 P street, and on June 5, 1907, Johnson filed a like application with said excise board for a license to sell intoxicating liquors at No. 319 North Ninth street. At a special meeting of the board held on June 13, 1907, the following was adopted: "Whereas 35 (licenses) have already been granted for the sale at retail of spirituous, vinous and malt liquors during this municipal year in the city of Lincoln, or about one licensed saloon to every 1,700 of our population, therefore be it resolved by the members of the excise board that it is the sense of this board that no further retail licenses be granted during this municipal year in excess of the number already granted. Voting Aye, Harpham, Powell. Nay, Brown." At a special meeting held July 6, 1907, the following proceedings were had relating to the application of Jugenheimer: "Resolved that the application of Gus A. Jugenheimer for a saloon license at No. 1119 P street, Lincoln, Nebraska, be, and the same is hereby, denied for the reason that 35 retail saloon licenses have already been issued in this city, some of which are near said location, and, upon careful consideration of the question, we believe that the public interest requires that no additional licenses be granted in this city, and particularly that none be granted at the location named for this municipal year. Voting Aye, Harpham, Powell. Nay, Brown." A similar resolution rejecting the application of Johnson for a license at No. 319 North Ninth street was adopted by the board. The applicants appealed to the district court, and the court reversed the action of the board, and ordered a license to issue to Johnson upon his paying the city treasurer the sum of $1,500 required by the rules and regulations of the board as a license fee. In the Jugenheimer case the court directed that the case be remanded to the board for further proceedings. From these orders of the district court, the city of Lincoln and the excise board have appealed to this court.

From a written opinion filed by the district judge, we quote the following: "Under the general ordinances or rules of the excise board providing for the granting of licenses, the courts have universally held that city authorities have no right to make an arbitrary discretion in granting licenses. They cannot grant the same to a favored few, and refuse it to another, who has in all respects complied with the ordinances and laws of the state, and who is deemed to be a suitable person for the transaction of such business, as it appears from the record in this case the applicant is. Municipal corporations are mere creatures of the legislative will, and can exercise no power except such as the state has conferred upon them. When the city authorities enter upon a policy of permitting traffic in intoxicating liquors, they open the way to all persons who are suitable under the provisions of the law to engage therein, and all applicants must be treated alike. If the excise board, having entered upon such policy of granting licenses to some, can curtail the number who shall be thus favored, such powers would be dangerous, and open the way to greater evils than would flow from the rule of 'equal justice to all people, and special privileges to none.' It is possible that, at the outset of the municipal or licensing year, had the city authorities declared a policy of limiting the number of saloons to 35 or less, and had permitted all persons desiring to enter into the traffic to file their applications, and had then found some fair and equitable way to select from the number of applicants those the authorities deemed best fitted to engage in the business, the law might sustain such a proceeding; but that question is not before the court from the record presented in this case." We have set forth so much of the opinion of the trial judge as shows the reasons which governed him in reversing the action of the board, both in fairness to him, and because it fairly presents the contentions of the applicants that, where the excise board of a municipality adopts the policy of licensing the sale of intoxicating

liquors, it has no discretion in limiting the number who may engage in the business, but must license all applicants who meet the requirements of our statute and the rules of the board, however great the number may be, and regardless of the wants of the community in that respect.

In times not very remote little more restriction was thrown about the business of liquor selling than about any other business. The evils of the traffic finally became so pronounced that it presented to the legislature the problem of satisfying the demands for the sale of intoxicants, and at the same time minimizing the well-understood evils of the traffic. In the leading case of *Pleuler v. State,* 11 Neb. 547, Judge LAKE, in discussing this question, said: "The leading motive of the legislature in enacting the law could not have been the raising of revenue, but rather to thoroughly regulate, and as far as practicable suppress a traffic, the tendency of which was believed to be productive of pauperism, vice, misery, and crime, to the great injury of the people of the state at large, and especially of the particular locality where it is carried on." The solution made by the legislature is found in the provisions of the Slocumb law (Ann. St. 1907, secs. 7150-7199a) which makes the sale of intoxicating liquors unlawful by any person not licensed to conduct the business. We start out, therefore, with the facts before us that, until a party has secured a license, he has no right to engage in the sale of intoxicating liquors, and that no one has an absolute right to a license, but must submit his claim therefor to the judgment and discretion of the excise board. The rights of the citizens in this respect are so well set forth by Mr. Justice Field in *Crowley v. Christensen,* 137 U. S. 86, that we quote somewhat at length from the opinion in that case: "It is undoubtedly true that it is the right of every citizen of the United States to pursue any lawful trade or business, under such restrictions as are imposed upon all persons of the same age, sex and condition. But the possession

and enjoyment of all rights are subject to such reason
able conditions as may be deemed by the governing
authority of the country essential to the safety, health,
peace, good order and morals of the community. Even
liberty itself, the greatest of all rights, is not unrestricted
license to act according .to one's own will. It is only
freedom from restraint under conditions essential to the
equal enjoyment of the same right by others. It is then
liberty regulated by law. The right to acquire, enjoy and
dispose of property is declared in the constitutions of
several states to be one of the inalienable rights of man.
But this declaration is not held to preclude the legislature
of any state from passing laws respecting the acquisition,
enjoyment and disposition of property. What contracts
respecting its acquisition and disposition shall be valid,
and what void or voidable; when they shall be in writing
and when they may be made orally; and by what instru-
ments it may be conveyed or mortgaged are subjects of
constant legislation. And, as to the enjoyment of prop-
erty, the rule is general that it must be accompanied with
such limitations as will not impair the equal enjoyment
by others of their property. *Sic utere tuo ut alienum non
lædas* is a maxim of universal application. For the pur-
suit of any lawful trade or business, the law imposes
similar conditions. Regulations respecting them are al-
most infinite, varying with the nature of the business.
Some occupations by the noise made in their pursuit,
some by the odors they engender, and some by the dangers
accompanying them, require regulations as to the locality
in which they shall be conducted. Some by the dangerous
character of the articles used, manufactured or sold re-
quire, also, special qualifications in the parties permitted
to use, manufacture or sell them. All this is but common
knowledge, and would hardly be mentioned were it not
for the position often taken, and vehemently pressed, that
there is something wrong in principle and objectionable
in similar restrictions when applied to the business of
selling by retail, in small quantities, spirituous and intox-

icating liquors. It is urged that, as the liquors are used as a beverage, and the injury following them, if taken in excess, is voluntarily inflicted and is confined to the party offending, their sale should be without restrictions, the contention being that what a man shall drink, equally with what he shall eat, is not properly matter for legislation. There is in this position an assumption of a fact which does not exist, that when the liquors are taken in excess the injuries are confined to the party offending. The injury, it is true, first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self-abasement, which it creates. But, as it leads to neglect of business and waste of property and general demoralization, it affects those who are immediately connected with and dependent upon him. By the general concurrence of opinion of every civilized and Christian community, there are few sources of crime and misery in society equal to the dram shop, where intoxicating liquors, in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying. The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. The sale of such liquors in this way has therefore been, at all times, by the courts of every state, considered as the proper subject of legislative regulation. Not only may a license be exacted from the keeper of the saloon before a glass of his liquors can be thus disposed of, but restrictions may be imposed as to the class of persons to whom they may be sold, and the hours of the day and the days of the week on which the saloons may be opened. Their sale in that form may be absolutely prohibited. It is a question of public expediency and public morality, and not of federal law. The police power of the state is fully competent to regulate the business—to mitigate its evils or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by

retail; it is not a privilege of a citizen of the state or of a citizen of the United States."

In *Jugenheimer v. State Journal Company, ante,* p. 830, we did not enter upon any discussion of the discretionary powers of the board in granting or refusing a license, for the reason that, in our judgment, the facts in that case were an ample justification for the action of the board. In the cases now under consideration the question of how far the board may exercise a discretion in refusing a license is squarely presented, and, while the board has recited in its record that one reason for its action in the present cases is that no license should be issued for conducting a saloon at the places named by the applicants, we will proceed to determine these appeals upon the theory adopted by the district court—that the primary cause for the refusal of the licenses was the fact that the board had determined to limit the saloons to 35 in number. It has already been determined that the excise board may, in the exercise of a sound discretion, limit the number of saloons in any certain locality of the city. *In re Jorgensen,* 75 Neb. 401. The question whether we shall go a step further, and hold that the excise board may, in its discretion, limit the number of saloons in the city, is the question now presented. On the part of the applicants it is urged that, having adopted the policy of licensing saloons in the municipality, the excise board have no discretion in limiting the number, but must issue a permit to every person applying therefor, assuming always that they have complied with the requirements of the statute and the rules of the board; that, when these requirements have been met by the applicant, the business of selling intoxicating liquors must, like all other branches of business, be open to every one, and that the applicant himself is the only judge of whether the popular demand for liquor will be supplied by those already licensed, or whether more saloons are required and desirable. On the other hand, it is argued by the appellants that the excise board has a wide discretion in saying

what number of saloons may be operated in the city, and that, when this discretion has been fairly and judiciously exercised, the courts cannot interfere to control it.

An extended examination of the authorities favors the contentions of the appellants. It is almost universally held that the object of a statute, such as the Slocumb law (Ann. St. 1907, secs. 7150-7199*a*), was not to convert the courts into excise boards, but merely to require a review of their action where an application for a license has been arbitrarily denied, or denied without good or solid reasons therefor. It has been said that the board, with its facility for inquiry by evidence or otherwise, is peculiarly qualified to pass upon the question of the propriety of issuing or refusing a license in a given case, and that its findings should in all but extreme cases meet with approval; that the legislature has lodged such discretion with the board, and it should remain there, except in a clear or in an extreme case of abuse. *In re Excise License*, 38 N. Y. Supp. 425. The question we are considering was determined by the supreme court of New York in *People v. Bennett*, 23 N. Y. Supp. 695. In the body of the opinion it is said: "I am not prepared to say that commissioners of excise may not, in the exercise of their discretion, limit the number of licenses granted by them, and refuse to issue a license, because there are already a sufficient number of places and persons licensed to sell liquor in their town, and therefore decide that additional license is not needed." In *Gross's License*, 1 Super. Ct. Rep. (Pa.) 640, the licensing board made the following record: "Taking into consideration our personal knowledge and information in this case, as we are required to do in most applications, we have determined that another licensed place in Sunbury is unnecessary, and therefore refuse the license." This was a legal reason, and not subject to review by the appellate court. In *State v. Common Council*, 94 Minn. 81, the following was held: "The question whether a license for the sale of intoxicating liquors shall be granted to an applicant

therefor within the city of Northfield rests in the sound judgment and discretion of the common council, in the exercise of which they act judicially, and not ministerially, and their action cannot be controlled or reviewed by mandamus. The council may, if in its judgment the best interest of the inhabitants of the city demand it, limit the number of saloon licenses to be granted." In the body of the opinion it is said: "The provisions of the charter vest in the common council authority to regulate and control the sale of intoxicating liquors within the city, and in exercising that authority the council is clothed with discretionary powers, the exercise of which cannot be controlled by the courts. The power to regulate and control includes the power to do all that is deemed, in the judgment of the council, for the best interests of the municipality and its inhabitants. It necessarily confers the power to refuse a license, or to limit the number of licenses to be granted, when, in the judgment of the council, the welfare of the city suggests such action." In the *Jorgensen* case, Judge Holcomb, who wrote the opinion, and who was also the author of the opinion in *State v. City of Alliance*, 65 Neb. 524, said: "Can it be said that the board's position in refusing the license in the case at bar is untenable, and that it acted arbitrarily in respect of the matter, for the reasons stated? We are unable to say from the record that such is the case. The presumption ought to be indulged in that the action was taken in good faith and from right motives, and with the view of best conserving public interest. We are not warranted in drawing other inferences from the record before us. The rule adopted appears to operate on all alike. Its object is to limit the number of saloons in a certain locality. * * * That such a limit is required in the interests of law and order, and their due and orderly enforcement, must, we think, be accepted upon the mere statement of the proposition. * * * This right of limitation as to the numbers was distinctly recognized in *State v. City of Alliance*, 65 Neb. 524."

If the power to limit the number of saloons in any one locality of the city should be extended to the board in the public interest, the same considerations require us to go one step further and say that the discretion of the board should extend to determining and limiting the number of saloons that may be allowed to do business in the city. While we are supported in this holding by the weight of authority, there are other reasons for so holding in this state, which, so far as our examination has extended, do not exist, or at least have not been referred to in the opinions cited from other states. Section 7963 Ann. St. 1907, which gives to the excise board exclusive control of the licensing and regulation of intoxicating liquors, also makes it the duty of that board to appoint the chief of police and the police force of the city. That part of the section referred to is in the following language: "The excise board shall have power and it shall be their duty to appoint a chief of police and such number of policemen and other officers as may be necessary to police the city, and protect persons and property and maintain peace and good order; provided, however, that the excise board is limited in the number of such appointees to such number as shall require, in payment of salaries, the expenditure of the funds provided for such purpose by the mayor and council; and provided, further, that the number of policemen so appointed shall not exceed one to every 2,500 of population." The peace and good order of the city is committed to the care of this board. The number of police that may be appointed for this purpose is limited to one officer to every 2,500 of the population, and is further limited by the funds which the mayor and council may provide for the payment of the force. Experience in municipal affairs has demonstrated that increasing the number of saloons in a municipality beyond the reasonable wants of the people tends greatly to increase lawlessness and to make the administration of law and the preservation of order more difficult. The normal trade of any community will furnish patronage for a certain number

of saloons. When the number is increased beyond that required to satisfy the normal demand, the saloon-keepers are compelled, in order to make the business profitable, to resort to all manner of vices to create an artificial demand for liquor and an increase in the consumption of liquor beyond the normal. The evil consequences flowing from these practices, and the increased difficulty in the preservation of peace and order and the enforcement of law caused by such a situation can be readily seen. If the public is to have any protection from an undue multiplication of saloons in a city, there must be vested somewhere the power to limit the number; there must, if the public interests in this respect are to be guarded, be power vested in the body granting the license to determine what the public interests require, as to the number of licenses, as well as the places where the traffic in intoxicating liquors may be conducted. To say to the board that it shall be responsible for the peace and good order of the city, and then to limit the number of officers it may appoint for that purpose, and deny it the widest discretion in limiting the agency most productive of lawlessness, is a condition which the legislature never contemplated, and which the courts should not approve. It is obvious that the number of saloons, where disorder is most likely to arise, should, to a certain extent, be measured by the means placed at the disposal of the board to police the city and preserve order. While it might be better to formulate a rule limiting the number of saloons prior to the time set for applying for a license, and then to devise some equitable way in which the licenses shall be awarded, we cannot say that the failure of the board to proceed in this manner is so objectionable as to require a reversal of its action. It is manifest that the board could not beforehand anticipate or know the number of applicants who would apply for a license. If the number of applicants were less than the board thought requisite to supply the normal demand, all could be accommodated; but, when it became evident that the applications were in excess of the number required, there was but

one course to pursue, which was then adopted by the board, to refuse all applicants who applied thereafter.

One other question demands our consideration. The city of Lincoln and the excise board perfected this appeal from the judgment of the district court reversing the action of the board in refusing licenses to the applicants. It is now insisted that the excise board is not a proper party to the appeal; that to allow the excise board to take an appeal in support of its own order would, in principle, be like allowing a court to appeal from the judgment of an appellate court reversing its decision. It must be remembered, however, that the excise board performs public .functions of vital consequence to the city. In the exercise of these functions the discretion granted it by the state has been set aside by the district court. If the city or the excise board cannot appeal, who can question the action of the district court? If the board cannot appeal, then it is within the power of the district court to determine the number of saloons that may be conducted in any municipality. In the case of *People v. Sackett*, 44 N. Y. Supp. 593, one Thomas appealed to the court from an order made by Sackett, as county treasurer, refusing him a liquor license, and the order was reversed by the court to which an appeal was taken. Sackett appealed from the order of the court reversing his finding, and it was urged, as here, that Sackett had no appealable interest. The appellate court said: "The county treasurer, by that order, is directed to do an act which, as a public officer, he is not authorized to do; and, although it does not affect him pecuniarily, he has such an interest in the subject as to make him a party aggrieved, within the meaning of section 1294 of the code." In *People v. Jones*, 110 N. Y. 509, the court of appeals held that, when the action of the land commissioners was reversed, they could appeal. In the opinion it is said: "That decision interferes with them in the discharge of their duties. * * * It is their duty, representing both public and private interests, to defend any determination which they have made and

which they believe to be right. * * * While, therefore, they did not have any property or pecuniary interest in the matter in controversy, they were, nevertheless, we think, in a legal sense aggrieved by the decision appealed from. That officers thus situated may be both appellants and respondents upon appeals to this court is shown by the uniform practice for many years." Other cases in support of this view are cited in the opinion. Section 7153, Ann. St. 1907, provides for an appeal in this class of cases by any party feeling himself aggrieved by the decision in the case. We have no doubt that by the reversal of its decision, and by the order of the district court to issue a license in one case, and to reconsider its action in the other, the excise board was, within the meaning of the statute, "an aggrieved party," and entitled to appeal.

In our judgment the order of the district court should be reversed, and the order of the excise board affirmed.

EPPERSON and GOOD, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the order of the excise board affirmed.

JUDGMENT ACCORDINGLY.