## STATE Ex Rel. GRIMES Et Al. *v.* BOARD OF COM-MISSIONERS OF CITY OF LAS VEGAS Et Al.

No. 2943

July 8, 1931. 1 P. (2d) 570.

(SANDERS, J., dissenting.)

*Chas. Lee Horsey,* for Petitioners:

*F. A. Stevens*, for Respondents:

## OPINION

By the Court, DUCKER, J.:

This is an original proceeding in mandamus wherein petitioners seek to have this court compel the respondents to grant them a gaming license to open, conduct, and carry on in the city of Las Vegas a gambling game known as craps. A demurrer was filed to the petition, which of course admits the well-pleaded facts. Among these facts are the following: On the 30th day of March, 1931, the respondent board of city commissioners adopted an emergency ordinance to prohibit gaming and the operation of slot machines in the city of Las Vegas, without first obtaining a license therefor. This ordinance is designated as ordinance No. 165, and contains seventeen sections.

Petitioners filed their application for said gambling license with the city clerk of the city of Las Vegas on the 7th day of April, 1931. On the same day and subsequent to the filing of petitioners' application the board laid over for future consideration the applications of one Ethel W. Genther and one C. H. Mackay for gambling licenses, and granted gambling licenses to the following named applicants: The Boulder Club, the Las Vegas Club, A. T. McCarter at the Exchange Club, and to Sticker and Morgan at the Northern Club, and adopted the following resolution: "Resolved: That this Board

of City Commissioners of the City of Las Vegas not grant any gambling licenses except to those places of business that held gambling licenses in the previous quarter and that new licenses not be considered until a zone is established for the operation of gambling houses, and a policy is adopted by the Board governing the issuance of new licenses."

On the 17th day of April, 1931, the board adopted a resolution rejecting petitioners' application for a gambling or gaming license. In this resolution rejecting petitioner's application the following reason for such refusal is given, to wit: "For the reason that under Ordinance No. 165 of said City six gaming licenses (exclusive of licenses issued solely for the operation of slot machines) have already been issued in this city and upon careful consideration of the question we believe that public interest requires that no additional licenses (other than licenses solely for the operation of slot machines) and for additional games, at the location for which license is already granted, under the provisions of section 9 of said Ordinance No. 165, 'Any licensee holding a valid existing license from the City of Las Vegas, and from the County of Clark, State of Nevada, for a current quarter may, during such current quarter, secure a license for additional slot machines, games or devices, as the case may be, over and above the particular number of slot machines, games or devices for which, he, they or it holds a license, for the remainder of the quarter by paying to the City Clerk the license fee above provided, for the additional particular slot machine, game or device, as the case may be, and for which the City Clerk shall issue an additional license for the remainder of such quarter, and the additional license shall be upon the same terms and conditions as though issued under the provisions of section 8 of this Ordinance,' be granted in this city in excess of the number already granted, until the further order of this Board and until further or other gaming licenses (other than licenses solely for the operation of slot

machines) are reasonably necessary for the accommodation of the public and the granting of such further or other licenses will not contravene public interest and will not require an excessive amount of police protection for a city the size of Las Vegas, Nevada, having in mind the funds provided for police protection under the City's 1931 and 1932 Budgets heretofore adopted, and the state of the City funds applicable to police protection."

Section 7 of ordinance No. 165 provides as follows: "The Board of City Commissioners, in the exercise of their discretion, may refuse to grant or renew the license provided for in this Ordinance, to any person, firm, association or corporation, and may also revoke any license granted hereunder, if in their judgment or discretion it should appear to them that the licensee is not a proper person, firm, association, or corporation to carry on or conduct the slot machine, device and/or game for which the license is granted, or that such slot machine, device and/or game is not being properly or fairly conducted. Upon such revocation the City of Las Vegas shall be entitled to retain the license fee theretofore paid for such license."

It is alleged that petitioners have no right of appeal from the action of the board, or any other plain, speedy, or adequate remedy at law. It is further alleged that petitioners possess all of the qualifications prescribed by law or by any ordinance of said city of Las Vegas for gambling or gaming licenses, and the refusal to grant them a license was arbitrary and unlawful. The same contention was made by petitioner in his oral argument and in his memorandum thereof filed herein.

The argument is this: That, inasmuch as the 1931 gambling act prescribes no qualifications other than that the applicant must be a citizen of the United States, the council is powerless to prescribe additional qualifications, but must on proper application grant a license to any such, or, if they have any discretion, must exercise it through some prescribed standard general in its nature, which will apply equally to all; that otherwise the

issuance of a license would rest within the power of the council to grant or refuse at their mere whim or caprice and therefore amount to a discrimination unlawful under the constitution.

It is argued that section 7 of the ordinance is void for the reason that it gives the council the power to discriminate in the matter of issuing licenses.

The contention that the discretion to grant or withhold a license must be exercised through some prescribed uniform rule of action finds support in the leading case of Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, and a number of state decisions accepting the doctrine there announced. It is to be noted that the case of Yick Wo and those adhering to its doctrine were dealing with some useful business or calling in which a property right or vested interest could be acquired. Even among such, exceptions to the establishment of some uniform rule of action have been recognized, as in cases where it was difficult or impracticable to lay down a definite comprehensive rule; St. Louis Consolidated Coal Co. v. Illinois, 185 U. S. 203, 22 S. Ct. 616, 46 L. Ed. 872; Ex Parte Whitley, 144 Cal. 167, 77 P. 879, 1 Ann. Cas. 13, or where the determination of personal fitness was involved, State ex rel. Minces v. Schoenig, 72 Minn. 528, 75 N. W. 711.

But it has been held that, for the carrying on of a business of a character regarded as tending to be injurious, such as dealing in intoxicating liquor, a wide discretion may be given to licensing officers to grant or withhold a license without prescribing definite and uniform rules of action. State ex rel. Crumpton v. Montgomery et al., 177 Ala. 212, 59 So. 294; Perry v. City Council, 7 Utah, 143, 25 P. 739, 740, 998, 11 L. R. A. 446; In Re Jugenheimer, 81 Neb. 836, 116 N. W. 966, 969, 18 L. R. A. (N. S.) 386.

We think the distinction drawn between a business of the latter character and useful trades, occupations, or businesses is substantial and necessary for the proper exercise of the police power of the state. Gaming as a calling or business is in the same class as the selling of

intoxicating liquors in respect to deleterious tendency. The state may regulate or suppress it without interfering with any of those inherent rights of citizenship which it is the object of government to protect and secure. 12 R. C. L. 709.

The legislature of 1931, by an act approved March 19, 1931, has sanctioned divers forms of gambling under license. Stats. 1931, p. 165 et seq. The only qualification prescribed by the statute is that the applicant for a license must be a citizen of the United States. Section 1.

 The legislature has, however, by amendment enacted subsequently to the passage of the 1931 gambling act, to wit, on March 27, 1931, clothed the board of commissioners of the city of Las Vegas with power in the premises. Stats. 1931, p. 374, 381, 382. In section 10 of the amendment appear the following delegations of power to the board of commissioners: "To fix, impose and collect a license tax on all * * * games and gaming houses; to license and regulate gambling as allowed by law and to prohibit gambling in all its various forms." That the board of commissioners has power under this amendment to regulate gambling in the city of Las Vegas, and has power, notwithstanding the legislature has legalized gambling, to absolutely prohibit it within the city limits, or prohibit it in part by zoning, cannot be denied. The power to restrict the number of licenses in the city is, we think, a very necessary implication from the power to license and regulate gambling. This discretion is derived from the police power of the state. It is necessarily incidental to the delegated power to license and regulate. On account of the nature of the business of gambling, which is capable of being so conducted as to be a source of evil, a very wide discretion is thus conferred, not only to restrict the number of licenses in the city, but to pass all reasonable rules and regulations concerning it which the city authorities may deem necessary for the police government of the municipality.

The wide discretion conferred upon a city in the

power to regulate a business of this character and the reasons for it are well discussed in Perry v. City Council, supra. The court said in the body of the opinion:

"The question now comes, has the council any further discretion with respect to granting such licenses? [Licenses to sell intoxicating liquors.] Under its power to regulate, has it any discretion as to the person to whom licenses shall be granted, as to the place of business, or as to the number of licenses to be granted?. * * *

"It is apparent from the act under consideration that the intention of the legislature in conferring on the council the power to regulate the sale of liquor was to enable that body to protect society from the evils attending it. * * *

"The authority is delegated to the councilmen as reasonable men, and with the expectation that they will employ reasonable means. To intrust the privilege of selling intoxicating liquors to persons whose antecedents, habits, and characters are such as to inspire confidence in them, and warrant the belief that they would not violate the law by selling to minors, habitual drunkards, or intoxicated persons, and would be likely to conduct their business in other respects with due regard to good morals and the peace and happiness of society, would appear to be within that discretion included in the right to regulate. * * *

"A saloon along-side of a school-house or a church would be very undesirable, and to establish one alongside of a man's home would be regarded as very objectionable. To authorize the retailing of liquors in the midst of the homes of the people would be palpably wrong. Neighborhoods infested with liquor saloons are not suitable communities for boys and girls to grow up in; and so a limitation of the number of places for retailing intoxicating liquors in a city would be a reasonable regulation.

"Because the council may be authorized to license liquor sellers it does not follow that they must license all who may apply. * * *

"General tests might be established by ordinance, by

which to determine the fitness of persons to be intrusted with the business of selling liquor, and ordinances might be adopted designating localities in which the business may be conducted, and limiting the number. But we are not prepared to say that the business may not be regulated in such respects without ordinance.

"The charter confers the power to regulate the traffic upon the city, without expressly requiring it to be exercised by ordinance. But it is said that the councilmen may act from mere whims, caprice, partiality, or prejudice unless the regulation is by ordinance. The court should assume that public officers will act from proper motives until the contrary appears.

"It is also claimed that the court must presume that the council acted arbitrarily or without sufficient reason in refusing the license, because no reason appears upon its record. The court will not assume that the council refused the license arbitrarily, and without sufficient reason, without some proof. Being public officers, and acting under the sanction of an oath, the court will assume that they acted lawfully until the contrary appears."

In concluding its opinion, the court decided: "After a careful consideration of the statutes, the ordinances, and the cases cited, we hold that the defendant possesses the power to license, regulate, and tax the liquor business, and that in the use of such authority it may exercise a reasonable discretion in determining who are suitable persons to intrust the business to, the places where it may be conducted, and the number of licenses it will issue, and that the council may exercise that discretion when the application is made, when it has not done so by ordinance before, and that the court will not assume that the council acted arbitrarily, or from any improper motive, without some evidence to that effect. The writ of mandamus is denied."

The section of the statute under which the foregoing decision was rendered, aside from certain prohibitions and details, reads: "The city council shall have the following powers: (40) To license, regulate, and tax the

manufacturing, selling, giving away, or disposing of in any manner, any * * * intoxicating liquors."

It is said in Crowley v. Christensen, 137 U. S. 86–91, 11 S. Ct. 13, 15, 34 L. Ed. 620, as to the sale of intoxicating liquors: "The police power of the state is fully competent to regulate the business, to mitigate its evils, or to suppress it entirely. * * * As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. The manner and extent of regulation rest in the discretion of the governing authority."

In the instant case the manner and extent of regulation within the city limits has been delegated to the discretion of the governing authority of the city, and, unless we can say that that discretion has been exercised in an arbitrary manner, the writ of mandamus must be denied. In the case of In Re Jugenheimer, supra, the power of a city council to limit the number of saloons in a city was squarely before the court, and squarely decided in favor of such power. The court in its opinion in the Nebraska case cited, among others, the case of State ex rel. Howie v. Common Council of City of Northfield, 94 Minn. 81, 101 N. W. 1063, which held: "The question whether a license for the sale of intoxicating liquors shall be granted to an applicant therefor within the city of Northfield rests in the sound judgment and discretion of the common council, in the exercise of which they act judicially, and not ministerially, and their action cannot be controlled or reviewed by mandamus. The council may, if in its judgment the best interests of the inhabitants of the city demand it, limit the number of saloon licenses to be granted."

The Nebraska court quoted approvingly from the body of the opinion of the Minnesota court as follows: "The provisions of the charter vest in the common council authority to regulate and control the sale of intoxicating liquors within the city, and, in exercising that

authority, the council is clothed with discretionary powers, the exercise of which cannot be controlled by the courts. The power to regulate and control includes the power to do all that is deemed, in the judgment of the council, for the best interests of the municipality and its inhabitants. It necessarily confers the power to refuse a license, or to limit the number of licenses to be granted, when, in the judgment of the council, the welfare of the city suggests such action."

As to the claim made in the instant case that the city authorities must prescribe some general standard of action, the court, in the case of In Re Jugenheimer, said: "While it might be better to formulate a rule limiting the number of saloons prior to the time set for applying for a license, and then to devise some equitable way in which the licenses shall be awarded, we cannot say that the failure of the board to proceed in this manner is so objectionable as to require a reversal of its action."

The generality of the doctrine of the foregoing cases is mentioned by Mr. Black in his work on Intoxicating Liquors. He says: "The rule obtains in a few of the states that if a person who desires a liquor license brings himself within the terms of the law, by complying with all the statutory preliminaries, and possessing the requisite moral and other qualifications, he is entitled as a matter of law to be licensed, and the license cannot be withheld from him. But in far the greater number of states, the doctrine is now well settled that the court or board charged with the duty of issuing licenses is invested with a sound judicial discretion, to be exercised in view of all the facts and circumstances of each particular case, as to granting or refusing the license applied for. The principle is, that the licensing authorities act judicially, and not merely in a ministerial capacity. In determining the nature, as well as the existence, of this discretion, much will depend upon the language of the local statute, and this, of course, should be carefully scrutinized. But the general disposition, under all the diverse forms of statutory provisions, is to leave a

wide margin of discretion to the court or board hearing the application." See Muller v. Buncombe County Com'rs., 89 N. C. 171.

▬ We conclude that the denial of petitioners' application for a license to conduct in the city of Las Vegas a gambling game known as craps was in the exercise of a sound discretion, and that the writ prayed for should be denied. In so holding we would not have it understood that we are of the opinion that the board could have granted the six licenses and denied petitioners' application by the process of selection merely. They could not do so in a case of this character any more than they could in the case of a harmless business useful in its tendency, without being guilty of that discrimination which is inhibited by our constitution.

In the case of In Re Jugenheimer, supra, the excise board, in the resolution denying the application, stated the number of licenses already issued, and stated it was their belief that the public interest required that no additional licenses be granted. This was a statement of a legal reason for denying the application.

▬ The same reason was given by the board in the case before us. It is evidence showing that the board did not act arbitrarily in granting six licenses in the city and denying petitioners' application. This, together with the presumption that officers who are acting under the sanction of an oath will act lawfully, is sufficient, in the absence of any evidence to the contrary, to rebut the claim of unlawful discrimination. While the board of commissioners was empowered to exercise such discretion independently of section 7 of ordinance No. 165, we are of the opinion that it was within the power of the board to adopt this section.

The writ of mandamus is denied.

COLEMAN, C. J.: I concur.

SANDERS, J., dissenting:

This case in mandamus brings under review the proceedings and resolutions of the board of commissioners

of the city of Las Vegas respecting the issuance and refusal to issue gambling licenses following the enactment by our last legislature of the so-called "Open Gambling Law" providing for the operation of slot machines, gambling games, and gambling devices enumerated therein under license; providing for certain license fees and the use of the moneys obtained therefrom. Stats. 1931, p. 165. The act became effective from the date of its approval on March 19, 1931, and repeals all acts and parts of acts in conflict with it. Section 13b of the act provides that nothing contained therein shall affect the powers conferred by the provisions of the charter of any incorporated city to fix, impose, and collect a license tax.

Prior to the enactment of the open gambling law it was made a felony to conduct or operate in this state the gambling games and gambling devices involved in this proceeding for profit.

The admitted facts of the case are substantially as follows:

Upon the adoption and approval of the so-called open gambling law, the city of Las Vegas at the same session of the legislature on, to wit, March 27, 1931, procured an amendment to certain sections of its articles of incorporation. Section 31, subsec. 10, was amended so as to give the board of commissioners the power to "license and regulate gambling as allowed by law, and to prohibit gambling in all of its various forms." Stats. 1931, p. 374.

Pursuant to the state law and said amendment, the board of commissioners on, to wit, March 30, 1931, proposed an ordinance entitled "An Ordinance to Prohibit Gaming and the Operation of Slot Machines in the City of Las Vegas, without first obtaining a license therefor, regulating the same, fixing the amount of such licenses, providing penalties therefor, and repealing Ordinances Nos. 77, 82, 88, 103, and 115, and all Ordinances and parts of Ordinances in conflict therewith." Section 7 of the ordinance is as quoted in the opinion of Justice DUCKER. It appears, in fact it is conceded, that the

ordinance did not and could not, under the city charter, become effective until on May 5, 1931. In the meantime a number of persons and association of persons, on and prior to April 7, 1931, filed with the clerk of the board of commissioners applications for licenses to conduct and operate the gambling games and gambling devices allowed by law. On said date there were on file the applications of petitioners and applications of the Boulder Club, the Las Vegas Club, the Exchange Club, and the Northern Club. Upon consideration of these applications it was moved, seconded, and carried that the applications of said clubs be approved and allowed. Upon this approval a discussion arose as to granting other licenses. This discussion was participated in by a number of citizens of Las Vegas who were present, and upon discussion the following resolution was adopted: "Resolved: That this Board of City Commissioners of the City of Las Vegas not grant any gambling licenses except to those places of business that held gambling licenses in the previous quarter, and that new licenses not be considered until a zone is established for the operation of gambling houses, and a policy is adopted by the Board governing the issuance of new licenses."

On April 9, 1931, at a recessed regular meeting of the board, a number of citizens being present, the board again entered upon the discussion of granting of gambling licenses and placing of a zone. On motion it was resolved as follows: "Resolved: That until the further order of this Board it be and is hereby established as the policy of this Board that no further gambling licenses be granted except those already granted for this quarter, and to those who held gambling licenses for the immediately preceding quarter; provided that this resolution shall not be construed to prevent the consideration of an application for and the granting of a license to a person of the Ethiopian Race for the conduct of a game or games in a place catering exclusively to persons of the same race only."

On April 17, 1931, the minutes of a recessed regular meeting of the board show that upon motion gambling licenses were granted Leo Kind and Thomas Rowan and the Big Four Club. At this meeting on motion duly made and carried a blanket resolution was adopted, the preamble of which reads as follows: "Whereas six gaming licenses under Ordinance No. 165 of this City (exclusive of licenses solely for slot machines) have already been issued in the City of Las Vegas, or a provision for about one licensed gaming house (exclusive of places where slot machines only are operated) to every one thousand five hundred (1500) of our population."

At this meeting the following resolution was adopted: "Resolved: That the application of Roy Grimes, D. J. McCauley and R. H. Davenport for gaming licenses to be operated under at Lorenzi Resort, in the City of Las Vegas, County of Clark, State of Nevada, be and the same is hereby denied for the reason that under Ordinance No. 165 of said City six gaming licenses (exclusive of licenses issued solely for the operation of slot machines) have already been issued in this City, and upon careful consideration of the question we believe that public interest requires that no additional licenses (other than licenses solely for the operation of slot machines, and for additional games, at the location for which license is already granted, under the provisions of Section 9, of said Ordinance No. 165, 'Any licensee holding a valid existing license from the City of Las Vegas, and from the County of Clark, State of Nevada, for a current quarter may, during such current quarter, secure a license for additional slot machines, games or devices, as the case may be, over and above the particular number of slot machines, games or devices for which he, they or it holds a license, for the remainder of the quarter by paying to the City Clerk the license fee above provided, for the additional particular slot machine, game or device, as the case may be, and for which the City Clerk shall issue an additional license for the remainder of such quarter, and the additional

license shall be upon the same terms and conditions as though issued under the provisions of Section 8 of this Ordinance,' be granted in this city in excess of the number already granted, until the further order of this Board and until further or other gaming licenses (other than licenses solely for the operation of slot machines) are reasonably necessary for the accommodation of the public and the granting of such further or other licenses will not contravene public interest and will not require an excessive amount of police protection for a city the size of Las Vegas, Nevada, having in mind the funds provided for police protection under the City's 1931 and 1932 Budgets heretofore adopted and the state of the City funds applicable to police protection."

At this meeting a number of applications for licenses were for the same reason rejected by resolution.

I am of opinion that the resolution rejecting the application of petitioners is invalid and illegal in this:

First, the resolution purports to be based upon the authority of ordinance No. 165, which admittedly was not in effect at the time the resolution was adopted. Consequently the disallowance of the petitioners' application was upon the authority of a resolution, and not ordinance No. 165. A resolution is not the equivalent of an ordinance, but rather an act of a temporary character, not prescribing a permanent rule of government, but is merely declaratory of the will of a corporation in a given matter, and in the nature of a ministerial act. 43 C. J. 519.

Second, the resolution was invalid and illegal in that it purports to grant licenses only to those who held gambling licenses for the immediately preceding quarter. It is inferable from this that the board had, prior to the enactment of the open gambling law, issued gambling licenses to the Boulder Club, Las Vegas Club, Exchange Club, and the Northern Club without authority of law, as under the law existing at the time no such license could legally have been granted.

Third, the resolution was invalid and illegal in that it gives a monopoly of the gambling concessions in the city of Las Vegas to the Boulder Club, Las Vegas Club, Exchange Club, Northern Club, and the Big Four Club, by providing that the licenses granted are to continue until in the opinion of the board it is reasonably necessary for the accommodation of the public that further or other licenses be granted. In that event the holders of the licenses granted are privileged to increase the number of gambling games as public necessity in the opinion of the board may require.

Fourth, the resolution was not adopted in the exercise of the police power, but for revenue purposes.

It is a fundamental principle of our system of government that the rights of men are to be determined by the law itself, and not by the let or leave of officers or boards acting in an administrative capacity. This principle cannot be surrendered or in effect nullified for the sake of expediency. Thompson v. Smith (Va.), 154 S. E. 579, 71 A. L. R. 604.

I quite agree with my associates that a state or a city has the power to prohibit the doing of an act altogether. It has the power to permit the doing of an act upon any condition, or subject to any regulation, however arbitrary or capricious it may be. Thompson v. Smith, supra, and cases cited.

Before the passage by Congress of the Volstead act this doctrine was pronounced more often in cases involving the granting, refusing, and revoking of licenses to sell intoxicating liquors or do things, which, because of their character, are, or tend to be, injurious, as, for instance, keeping a gambling house or a bawdy house, or operating a junk or pawnshop.

In Nevada, however, a gambling house is a privileged institution operated under the sanction of the law. The city of Las Vegas, although it had under its charter the power to prohibit gambling and gaming in all of its forms as allowed by law, did not choose to do so. On the contrary, its board of commissioners, not in the

exercise of its police power, undertook by resolution to arbitrarily grant licenses for revenue purposes to some and refuse to grant licenses to others of like character, under like conditions and circumstances.

I concede that the city of Las Vegas has by legislative enactment under its police, power to grant, refuse, and revoke under rules of general application gambling licenses, but may not by an arbitrary resolution of its board of commissioners arbitrarily refuse or revoke or grant a license to one and refuse a license to others of like qualifications, under like circumstances and conditions. Thompson v. Smith, supra. In other words, its board under the guise of police powers cannot say that a gambling license shall be granted to A and the same right denied to B.

The opinion of Justice DUCKER concludes with this language: "The same reason was given by the board in the case before us. It is evidence showing that the board did not act arbitrarily in granting six licenses in the city and denying petitioners' application. This, together with the presumption that officers who are acting under the sanction of an oath will act lawfully, is sufficient in the absence of any evidence to the contrary to rebut the claim of unlawful discrimination."

Here the contrary is shown by the board's own resolutions to the end that one person is granted a license and another of like qualifications, under like circumstances and conditions is denied a license. Where an ordinance or resolution is enacted in pursuance of legitimate exercise of police power and it is manifest therefrom that there is an unjust discrimination, courts interfere. The policy of the board of commissioners in the instant case as declared by its resolution in refusing a license to petitioners is that public morals, the public welfare, and police protection will best be served by conferring all of the gambling privileges in the city of Las Vegas on those who held licenses prior to the enactment of the open gambling law.

The argument that the resolution in question as a police regulation was a legitimate limitation upon an

occupation inherently injurious to public morals and public welfare is without force. The resolution upon its face shows that it was not motivated by any such high ideals. Upon the contrary, it is made to appear therefrom that, so long as the "fortunate" six are able to cope with the public demand for gambling, there will be no necessity for granting other licenses or creating a zone for gambling houses. In this respect the legal effect of the resolution is to limit the number of gambling houses but not the number of gambling games, thus giving the proprietors of six gambling houses the exclusive right and privilege of carrying on and conducting all gambling games as public interest in the judgment of the board of commissioners shall require. Some better or stronger reason than that shown in the resolution must appear to support the contention that the board had the authority or right to grant six licenses and reject the seventh application to conduct one more game allowed by law at a place not shown to be objectionable.

The argument that the resolution limiting the number of gambling houses and not the number of gambling games is in the interests of economy in the matter of the cost of police protection is also without force. The tax imposed under the proposed ordinance is essentially a license tax for revenue purposes and not for police regulation. It is a matter of common knowledge that legalized gambling in this state is supposed to result in a continuous source of increased revenue by day and by night for the benefit of the state, the counties, municipalities, and quasi municipalities within the state, for their general purposes.

It is fair to assume that the city of Las Vegas will share in the benefits in proportion to the number of licenses issued the several persons or associations of persons, as the case may be, as in the opinion of the board of commissioners of the city public necessity may require. Thus the veil of good morals and public welfare is torn from the face of the resolution, and its real policy, purpose, and effect is laid bare.

Under the admitted facts I am compelled to conclude that no valid or legal reason is assigned for the refusal of the board of commissioners to allow petitioners' application for a license to conduct one more gambling game in the city of Las Vegas as allowed by law, and that the action of the board in denying the application was arbitrary and discriminative; that the denial of the application was an abuse of power and not the exercise of a reasonable discretion in a lawful manner. I think the wrong done should be remedied by mandamus.