THE CHRONICLE & GAZETTE PUBLISHING CO., INC.

*v.*

ATTORNEY GENERAL & a.

*Hughes & Burns* (*Mr. Walter A. Calderwood* orally), for the plaintiff.

*Ernest R. D'Amours,* Attorney-General (by brief and orally), *pro se.* (*Gordon M. Tiffany,* Law Assistant, on the brief).

*Ralph G. McCarthy,* for defendant Durell, filed no brief.

Certain other defendants, *pro se,* filed no briefs.

KENISON, J.  A petition for a declaratory judgment is particularly appropriate to determine the constitutionality of a statute when the parties desire and the public need requires a speedy determination of important public interests involved therein.  *Tirrell* v. *Johnston,* 86 N. H. 530; *Woolf* v. *Fuller,* 87 N. H. 64; Anderson, Declaratory Judgments (Supp. 1946) 260.

The constitution of New Hampshire guarantees that the right to elect and be elected shall be free and equal.  "All elections ought to be free, and every inhabitant of the state, having the proper qualifications, has equal right to elect, and be elected, into office . . . " Bill of Rights, *art.* 11th.  Pursuant to this constitutional mandate the Legislature, at an early date enacted provisions to insure the purity of elections, R. L., *c.* 41.  Subsequently there was enacted "An act to prevent corrupt practices at elections, and to regulate expenditures for political purposes and provide for the publicity thereof."  Laws 1915, *c.* 169, which now appears in R. L., *c.* 42. This statute proceeded on the theory that an election was neither free nor equal if it was dishonest.  Recent decisions of the Supreme Court of the United States indicate that the theory was valid and the objective constitutionally permissible, *United States* v. *Classic,* 313 U. S. 299; *Smith* v. *Allwright,* 321 U. S. 649.

R. L., *c.* 42 entitled "Political Expenditures, Advertising, and Contributions" places maximum limits on political expenditures, provides for publicity thereof, and prohibits other forms of "corrupt practices" in order to make elections free, equal and honest. *Coutremarsh* v. *Metcalf,* 87 N. H. 127, 131, 132.  Section 9 of this chapter, prohibited any candidate or committee from paying newspapers any rate for political advertisements in excess of what was regularly charged by such newspaper "for commercial advertising occupying the same space and position and running the same length of time." Violation of this section was considered a corrupt practice under section 16 of the same chapter.  Laws 1945, *c.* 185, *s.* 2, amended

section 9 by making it equally a corrupt practice for a newspaper to receive a rate "in excess of the rate or rates regularly charged . . . for commercial advertising . . . of similar character and classification. . . . "

In considering the constitutionality of R. L., *c.* 42, *s.* 9, as amended by Laws, 1945, *c.* 185, certain well established doctrines will be applied. First, "It has always been the practice in this jurisdiction to follow the universally accepted doctrine that the constitutionality of an act passed by the coordinate branch of the government is to be presumed. It will not be declared invalid except on unescapable grounds." *Musgrove* v. *Parker*, 84 N. H. 550, 551. See also *Havens* v. *Attorney-General*, 91 N. H. 115, 121. Secondly, this court is not to compete with the Legislature in matters of opinion "upon points of right, reason and expediency." *State* v. *Moore*, 91 N. H. 16, 21. Thirdly, "a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that will sustain it, and the existence of that state of facts at the time the law was enacted must be assumed." *State* v. *Moore, supra*, 22.

Counsel have not cited and research has not disclosed any case "on all fours." It is contended that the statute is arbitrary and lacks a rational basis in establishing the commercial advertising rate as a maximum rate for political advertising. In the absence of any case in point, we turn to laws elsewhere to determine if this statute is unique. A random selection indicates that the rates for political advertising in newspapers or by radio stations are limited by various methods and standards. Utah prohibits a political advertising rate which exceeds "the regular rate charged by . . . newspapers." Utah Code Anno. (1943) 25-13-27. Mississippi confines political advertising rates to the "usual and ordinary rate." Miss. Code Anno. (1942) *s.* 3176. Texas prohibits such rates in excess of "regular advertising rates." Vernon's Texas Statutes (1936) Penal Code Art. 211. North Dakota provides that "no newspapers in the state shall charge more than the legal rates for the publication of legal notices." N. D. Code (1943) 46-0505. Minnesota confines political advertising rates to "regular advertising rates," or requires a statement of the amount paid in dollars and cents. Minn. Statutes (1941) *ss.* 211.03, 211.05. The constitutionality of these statutes appear to have been unchallenged or assumed. *Engelbert* v. *Tuttle*, 185 Minn. 608.

The statutes cited above prove that various states regulate political advertising and that the standard for a maximum or uniform rate is not dissimilar to that employed by our statute. "Laws expressly

relating to political advertising have been found in more than four-fifths of the States. A survey of legislation in this category reveals that it is predominately regulatory in character." Roper, State Advertising Legislation (U. S. Dept. of Commerce, 1945) 14.

It is argued that the statute is discriminatory as applied to newspapers since it does not regulate political advertising by and in automotive equipment, aircraft and transportation systems, nor such advertising by job printers or billboard advertisers. It is sufficient answer to this argument that "the State is not bound to cover the whole field of possible abuses." *Welch Co.* v. *State*, 89 N. H. 428, 432. So far as we know the Legislature may have concluded that political advertising in aircraft and transportation systems and other similar media was not so extensive or did not present the problems involved in newspaper and radio advertising. The proposition that the Legislature must regulate all or none is not accepted. We do not know the factual considerations upon which the Legislature made its determination but it is not to be assumed to be unreasonable if it can be supported on any reasonable basis. Merely because some political advertising might be done by a peripatetic popcorn vendor or some other transportation medium, human or mechanical, does not make the statute discriminatory.

Insofar as advertising by job printers and billboard advertisers is concerned, the Legislature may well have determined either that the regulation was not needed or the evils therein could not be regulated in the same manner as newspapers and radio stations. In short, the Legislature may regulate the major portion of any given problem within its police power without being required in so doing to control other minor and collateral evils connected therewith. "The Legislature is entitled to hit the evil that exists." *Queenside Hills Realty Co.* v. *Saxl*, 328 U. S. decided April 22, 1946. So far as it is disclosed from the record or can be ascertained by judicial notice, the Legislature had a reasonable basis for including newspapers and radio stations and excluding other advertising media in its regulation of political advertising. Any contrary conclusion is entirely without support in this record. We cannot say that the statute is arbitrary, discriminatory or lacking a rational basis.

Plaintiff's right of freedom of contract is not unconstitutionally invaded by this legislation. *Commonwealth* v. *Boston Transcript Co.*, 249 Mass. 477, which held unconstitutional a statute compelling a newspaper to publish findings of the Minimum Wage Commission at regular rates, is clearly distinguishable. The present statute does

not compel the plaintiff or any other newspaper to accept political advertising. It provides that if such advertising is accepted, the rate shall be the same as commercial rates. There is no special immunity to newspapers from the application of general laws. *Associated Press* v. *National Labor Relations Board,* 301 U. S., 103.

It cannot be successfully argued that freedom of the press is abridged. We do not have here a statute imposing a license tax on newspapers as in *Grosjean* v. *American Press Co.,* 297 U. S. 233. Neither does the statute suppress or censor newspapers as was attempted in *Near* v. *Minnesota,* 283 U. S. 697. The statute does not directly or indirectly exercise any previous restraint on the publication of news by newspapers. Freedom of the press is not an absolute right. *State* v. *Chaplinsky,* 91 N. H. 310, 317; *Giragi* v. *Moore,* 301 U. S. 670.

Concededly the plaintiff is not a public utility so that its rates may be regulated generally and therefore it cannot be compelled to accept political advertising. 87 A. L. R. 979. But it does not follow that because newspapers are not public utilities that they are immune from regulation. Newspapers, like other businesses, are subject to the police power. The view which once prevailed that a business is not subject to regulation unless affected with a public interest was considerably impaired in *Nebbia* v. *New York,* 291 U. S. 502, and was discarded in *Olsen* v. *Nebraska,* 313 U. S. 236. It is not necessary to consider the extent to which such regulation may go but so long as it does not involve suppression or censorship, the regulation of newspapers is as broad as that over other private business. *Associated Press* v. *United States,* 326 U. S. 1; Thayer, Legal Control of the Press (1944) *c.* 15.

The validity of the statute is attacked on the grounds that it does not set up an ascertainable standard of guilt. We conclude that the statute is as certain and definite as others heretofore upheld as constitutionally permissible. See *United States* v. *Wurzbach,* 280 U. S. 396, where the statute prohibited contributions for "any political purpose whatsoever." The statute is as definite as the words, "offensive, derisive and annoying," which were involved in *State* v. *Chaplinsky,* 91 N. H. 310, affirmed 315 U. S. 568.

Although it is not necessary to support the conclusion in this case on historical grounds (cf. *Attorney-General* v. *Morin,* 93 N. H. 40), it may be noted that for more than a century the New Hampshire Legislature has regulated certain aspects of advertising. The act of July 7, 1826, provided the amount of compensation that the New

Hampshire Gazette was to receive for printing acts and journals of the Legislature in its paper. Laws of N. H., Vol. 9, *c.* 72. Laws 1869, *c.* 1, *s.* 9, regulated advertising as follows: "If any advertising other than the laws of each session shall be ordered into any newspaper, the compensation therefor shall be the same as is usually paid by individuals for the same character and amount of matter in the same paper." Political advertising has been the subject of regulation for many years. Laws 1911, *c.* 106; Laws 1915, *c.* 169.

It is concluded that the Legislature has the authority to regulate the abuse of political advertising as a corrupt practice. 69 A. L. R. 377; *Commonwealth* v. *Evans* (Pa. Super.), 40 A. (2d) 137, 139.

The plaintiff's rate for political advertising was in excess of any rate for any kind of commercial advertising and is prohibited by the statute. The plaintiff cannot avoid the statute by filing a higher political rate of three dollars per inch under a commercial rate of one dollar and a half or two dollars per inch. The plaintiff is subject to the provisions of Laws 1945, *c.* 185.

*Case discharged.*

MARBLE, C. J., and JOHNSTON, J., dissented: the others concurred.

MARBLE, C. J., *dissenting:* The legislative power to fix the rates which a business enterprise may charge is restricted to businesses clothed with a public interest or to commercial activities which concern the public health, safety, morals, or general welfare. See Cooley, Constitutional Limitations (7th *ed.* ), 870-877; Black, Constitutional Law (3d *ed.*), 412-414; *Opinion of the Justices*, 88 N. H. 497-499.

The State cannot by mere legislative fiat convert a private business into a public utility (*Producers &c. Co.* v. *Commission*, 251 U. S. 228, 230, 231; 43 Am. Jur. 574), and it is generally held that the publication and sale of newspapers is a private enterprise not affected with a public interest. *Journal &c. Co.* v. *Company*, 286 Fed. 111, 113; *In re Wohl*, 50 F. (2d) 254, 257; *Shuck* v. *Herald*, 215 Iowa 1276, 1281; *Commonwealth* v. *Company*, 249 Mass. 477; *Philadelphia Record Co.* v. *Company*, 305 Pa. 372; *Mack* v. *Costello*, 32 S. D. 511. See, also, Snyder, "Freedom of the Press—Personal Liberty or Personal Property," 20 B. U. Law Rev. 1, 21.

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern.

The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; . . . a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose." *Nebbia* v. *New York*, 291 U. S. 502, 523, 537.

If, however, that legislation bears no substantial relation to a proper legislative purpose or is either arbitrary or discriminatory, it contravenes both the Fifth and the Fourteenth Amendments to the Federal Constitution as well as Articles 2 and 12 of our own Bill of Rights. *Opinion of the Justices*, 86 N. H. 597, 598; *Woolf* v. *Fuller*, 87 N. H. 64, 68; *State* v. *Paille*, 90 N. H. 347, 352; *State* v. *Moore*, 91 N. H. 16, 22; and cases cited.

Section 9, as originally enacted, was section 10 of chapter 169 of the Laws of 1915, entitled "An act to prevent corrupt practices at elections and to regulate expenditures for political purposes and provide for the publicity thereof." The section merely limited the sum which any candidate for public office might pay for newspaper advertising, but did not seek (as does Laws, 1945, *c.* 185, *s.* 2) to limit the rates which a newspaper may charge.

A corrupt act is an act done with an intent to give some advantage inconsistent with official duty and the rights of others. It includes bribery, but is more comprehensive. Bouvier's Law Dictionary (Baldwin's Century *ed.*), *p.* 239. There is much which indicates that the real purpose of chapter 185 is to secure to candidates an economical means of advertising rather than to guard against the remote chance that a candidate may "bribe" a newspaper proprietor to reject all political advertising except his own. The doubt on this subject need not be resolved, however, for, even if it be conceded that chapter 185 bears some relation to the prevention of corrupt practices, the statute must be held invalid because of its arbitrary features.

Judicial notice may properly be taken of the fact that political advertising, though extensive, is temporary. Moreover, the statute affords no protection to publishers of political advertisements against liability for libelous statements contained therein (see *Commonwealth* v. *Company*, 249 Mass. 477, 482), and the editorial scrutiny of "copy" submitted by a candidate for office, in order to insure its freedom from defamatory matter, may entail more labor than that required in the case of ordinary commercial advertisements.

The statute prescribes no method for determining whether the commercial rate it arbitrarily fixes as adequate for the service ren-

dered political advertisers is reasonable. There is no presumption that it is. *Sharon Herald Co.* v. *County*, 132 Pa. Super. 245, 251. See *Commonwealth* v. *Company*, *supra*.

Johnston, J., concurred in the foregoing opinion.