PARKES *v.* JUDGE OF RECORDER'S COURT.

QUINN *v.* SAME.

1. CONSTITUTIONAL LAW—RESTRAINTS MUST BE REASONABLE AND NECESSARY FOR PUBLIC GOOD.

The constitutional guaranty of life, liberty and of property is subject to such restraints as are reasonably necessary for the public good.[1]

---

[1] Constitutional Law, 12 C. J. §§ 440 (Anno), 962.

2. SAME—SUPPRESSION OF GAMBLING IS WITHIN POLICE POWER IF REASONABLE.

Gambling being injurious to the morals and welfare of the people, it is within the scope of the police power of the State to suppress it, but the restraints imposed must be reasonable.[2]

3. SAME—EXERCISE OF POLICE POWER MUST BE FOR PUBLIC WELFARE AND HAVE RELATION TO PURPOSE TO BE ACCOMPLISHED.

Essentials to a reasonable and proper exercise of the police power are that it must be for the public welfare, and that the measures adopted must have relation to the purpose sought to be accomplished.[3]

4. SAME—GAMING—STATUTES.

In so far as section 4, Act No. 176, Pub. Acts 1925, prohibits the publication of wagers and bets and the selling of pools before the event, it is a reasonable exercise of the police power to suppress gambling, but the prohibition of such publication after the event, without distinction as to the harmful and the harmless and without fixing a time limit after the event, is an unreasonable exercise of said power and is therefore unconstitutional under article 14, § 1, Federal Const., and article 2, § 16, Michigan Const.[4]

5. GAMING—POSSESSION WITH INTENT TO PUBLISH BETTING ODDS PROHIBITED—STATUTES.

Section 4 of Act No. 176, Pub. Acts 1925, is construed to prohibit possession of evidence of betting odds with intent to publish, rather than mere possession.[5]

6. COMMERCE—FOREIGN NEWSPAPERS BEING SOLD AND DISTRIBUTED NOT IN ORIGINAL PACKAGES NOT INTERSTATE COMMERCE.

Act No. 176, Pub. Acts 1925, prohibiting the publication or distribution of newspapers publishing betting odds, in so far as it applies to foreign newspapers not in original packages, but which are being sold or distributed in this State, is not an illegal interference with interstate commerce.[6]

7. CONSTITUTIONAL LAW—POLICE POWER.

If the matter is a proper subject of legislation in the exercise of police power, and the measures adopted are appropriately related to the object and have some obvious

---

[2]Constitutional Law, 12 C. J. §§ 428, 443; Gaming, 27 C. J. § 128; [3]Constitutional Law, 12 C. J. § 441; [4]Gaming, 27 C. J. § 128 (Anno); [5]Id., 27 C. J. § 177½ (Anno); [6]Commerce, 12 C. J. § 29.

tendency to accomplish it, the courts will not interfere, since it cannot be said to be unconstitutional, although the wisdom of the legislation may be open to question.[7]

Mandamus by James F. Quinn to compel Charles L. Bartlett, judge of the recorder's court of Detroit, to issue a warrant for the violation of Act No. 176, Pub. Acts 1925. Submitted June 15, 1926. (Calendar No. 32,058.) Writ denied October 22, 1926.

Mandamus by James F. Quinn and Charles A. Parkes to compel Charles L. Bartlett, judge of the recorder's court of Detroit, to issue warrants for the violation of Act No. 176, Pub. Acts 1925. Submitted June 15, 1926. (Calendar Nos. 32,059-32,061.) Writs granted October 22, 1926.

*Andrew B. Dougherty*, Attorney General, *Robert M. Toms*, Prosecuting Attorney, and *Valois E. Crossley*, Assistant Prosecuting Attorney, for plaintiffs.

*William L. Carpenter* and *Leo M. Butzel, pro hac vice*, for plaintiffs.

*Butzel, Levin & Winston* (*Isadore Levin* and *Angell, Turner & Dyer*, of counsel), for defendant.

McDonald, J. In the four cases which are here considered together, a mandamus is sought to compel the issuance of warrants against certain newspaper publishing companies for the violation of Act No. 176, Pub. Acts 1925, entitled "An act to suppress gaming and to prohibit the publication and furnishing of information concerning gaming."

Complaints were made against the Times Publishing Company, a Michigan corporation, engaged in the business of publishing and distributing a daily newspaper called The Detroit Times; the Evening News Association, also a Michigan corporation, publishing a

---

[7]Constitutional Law, 12 C. J. § 443.

daily newspaper called The Detroit News; The Detroit Free Press, a Michigan corporation, which publishes a daily newspaper called The Detroit Free Press; and the Union News Company, a foreign corporation, engaged in the business of selling and distributing in Michigan and elsewhere a daily newspaper called The New York Times.

The complaints allege a violation of section. 4, of Act No. 176, Pub. Acts 1925, which section reads as follows:

"SECTION 4. It shall be unlawful for any person, natural or artificial, or for the officers, agents, servants or employees of any corporation, directly or indirectly, individually or by agent, servant or employee, by means of any newspaper, periodical, poster, notice or other mode of publication or reproduction, to write, print, publish, advertise, deliver, or distribute or offer to deliver or distribute to the public or to any part thereof or to any person, any statement or information concerning the making or laying of wagers or bets or the selling of pools or evidences of betting odds on any race, contest or game or on the happening of any event not known by the parties to be certain, or any purported event of like character.   The acts herein prohibited may be deemed violations hereof when committed after any game, contest, race or event, as well as when committed before any such game, contest, race, or event, and the possession of evidence for the publication of any statement or information concerning the making or laying of wagers or bets or the selling of pools or betting odds, shall in the same manner be deemed a violation of this act, whether before or after the act evidenced thereby."

The Times Publishing Company is charged with having published, in the May 17, 1925, issue of the Detroit Times, the following:

"Turning into the homestretch, Sande sent Flying Ebony out in front again and the 60,000 people packed in the inclosure began shrieking, some crying the name of Captain Hal, some calling on Son of John.   You didn't hear the name of Flying Ebony much.   Like

Cochran's Coventry in the Preakness, the black colt was so lightly considered today that he was in the mutual field with eight others.    A $2 ticket on Flying Ebony paid $8.30."

In its issue of May 23, 1925, the Detroit Free Press is charged with having published the following:

"McTIGUE BETS $5,000 HE'LL HAVE KNOCKOUT.
"New York, May 22 (by the Associated Press).
"Mike McTigue has taken a jolt at his reputation for light punching.    He says he has laid $5,000 to $20,000 that he will stop Paul Berlenbach in their fight for the light heavyweight title at the Yankee Stadium one week from tonight."

The complaint against the Evening News Association charges the following publication in the May 22, 1925, issue of the Detroit News:

"New York—Mike McTigue has taken a jolt at his reputation for light punching.    He says he has laid $5,000 to $20,000 that he will stop Paul Berlenbach in their fight for the light heavyweight title at the Yankee Stadium one week from tonight.
"New York—Jimmy DeForest, match-maker for the Polo Grounds A. C., announced today that he had $5,000 sent him from the middle west, to bet at even money or 6 to 5 that Tom Gibbons will beat Gene Tunney when they meet here on June 5."

The Union News Company is charged with having sold and distributed in the city of Detroit, Michigan, the New York Times of May 26, 1925, containing the following:

"The latest London betting shows Lord Astor's Cross Bow and E. H. Morris' Manna to be joint favorites at 5 to 1 against; Lord Derby's Conquistador and Captain Jefferson Davis Cohen's Ptolemy II are each quoted at 10 to 1 against; Solario, 100 to 7 against; Runnymede and St. Becan, each at 100 to 6 against; Dignity and Zionist, each at 20 to 1 against, and Vicot, 33 to 1, taken and offered.
"The winner, which had Leverne Fator up, was the

9 to 9 favorite.   She raced the distance in 1:13 and it was her third victory in as many starts this season.

"The winner was the 11 to 3 favorite, with Jibe and Bruns held at 3 to 1."

The complaints were presented to the defendant. He refused to issue warrants on the ground that section 4 of the act on which the prosecution is based is unconstitutional.   These proceedings are to compel him to issue the warrants.

Against the validity of the act, it is first urged by the defendant that section 4 is unconstitutional because it is in conflict with the due process clause of the 14th Amendment to the Federal Constitution and that of the State Constitution.

*   *   *   "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Const. U. S. Art. 14, § 1.

"No person shall   *   *   .   *   be deprived of life, liberty or property without due process of law." Const. Mich. Art. 2, § 16.

The constitutional guaranty of life, liberty and of property is subject to such restraints as are reasonably necessary for the public good.   As a member of organized society the individual citizen has no right to do those things which are injurious to the common welfare.   He is wisely fenced about by governmental limitations which prevent him from infringing upon the rights of the public.   There are no constitutional guarantees which he can invoke against reasonable restraints imposed by the legislature in the exercise of its police power for the preservation of the health, morals and safety of the community.   Gambling is injurious to the morals and welfare of the people.

236—Mich.—30.

Therefore, it is the duty of the State and is within the scope of its police power to suppress it. And in enacting legislation for that purpose there is no invasion of constitutional rights unless the restraints imposed are unreasonable. So that, in considering the constitutionality of section 4 of the statute in question, we may begin with the assumption that legislation to suppress gambling and to prohibit the publication of information that would have a tendency to induce people to practice it, is well within the scope of the police power of the State. It is a proper subject for proper legislation, and it is not unconstitutional merely because it restricts the liberty of citizens. The principal test as to its validity is whether it is a reasonable exercise of such power.

"The police power of the State extends only to such measures as are reasonable, and the general rule is that all police regulations must be reasonable under all circumstances." 6 R. C. L. p. 236.

"By the term 'reasonable' is not meant expedient, nor that the conditions must be such as the court would impose if it were called on to prescribe what would be the conditions. They are to be deemed reasonable where, although perhaps not the wisest and best that might be adopted, they are fit and appropriate to the end in view, to wit, the protection of the public, and are manifestly adopted in good faith for that purpose. If the condition should be clearly arbitrary and capricious; if no reason with reference to the end in view could be assigned for it; and especially if it appeared that it must have been adopted for some other purpose,—such, for instance, as to favor or benefit some person or class of persons—it certainly would not be reasonable, and would be beyond the power of the legislature to impose. *State* .v. *Vandersluis*, 42 Minn. 129 (43 N. W. 789, 6 L. R. A. 119)." 7 Words and Phrases, p. 5953.

There are two very important essentials to a reasonable and proper exercise of police power. They are *first*, that it must be for the public welfare, and *second*,

that the measures adopted must have relation to the
purpose sought to be accomplished.    That the legis-
lation under consideration was intended for the public
good cannot be questioned.    The only question that
requires discussion is whether the measures which the
legislature adopted to accomplish the purpose of the
act are arbitrary and oppressive, or whether they are
appropriately related to the purpose and have a tend-
ency to accomplish it.    If they have such tendency
they must be held to be reasonable.    In seeking to
accomplish the object of the act, the legislature pro-
hibited the publication, advertising or distribution of
information concerning the making of wagers or bets
or the selling of pools or evidences of betting odds
on any race, contest or game, either before or after
the event.    It also made unlawful the possession of
evidence for such publication either before or after the
event.    It is not our business to determine whether
as an actual fact the publishing of such information
would induce gambling.    The legislature determined
that, and we must defer to its judgment unless the
publications declared to be unlawful have no such ap-
parent tendency.    It would seem to be unreasonable
for us to say that conveying such information to the
people would not have an obvious tendency to induce
them to gamble.    To what extent it would promote
gambling and to what extent the prohibitions of the
statute may prevent gambling, are questions with
which this court has no concern.    We are not per-
mitted to substitute our judgment on those questions
for that of the legislature.    Our right to interfere
ceases when it appears that the object of the legislation
is the public good, and that the measures provided for
accomplishing the object have an apparent tendency
in that direction.    So far as concerns the publication
of wagers and bets and the selling of pools before the
event, we have no hesitation in saying that the pro-

hibitions of the statute are reasonable.    The right
of the legislature to prohibit publication of betting
odds after the event presents a more serious ques-
tion.    It is apparent that every publication before
the event would naturally have a tendency to encourage
gambling.    It is made of a particular pending event
at which there would be an opportunity to gamble.
This is not true of every publication after the event.
Some undoubtedly would have a harmful tendency.
Some would not.    Everyone can conceive of many
publications after the event that could have no pos-
sible tendency to induce gambling.    The statute makes
no distinction between them, and fixes no limitation of
time after the event when the publication would be
considered harmful.    It prohibits all alike, the harm-
ful and the harmless; and therein lies its unreasonable-
ness.    It is argued that the court should construe the
statute as having application only to harmful publica-
tions, that is, publications that have a tendency to en-
courage gambling.    But when a case is prosecuted
under this statute, who is to determine whether the
publication is harmful?    By prohibiting them the
legislature has said that all publications of betting odds
after the event are harmful, because they encourage
gambling.    And it having so declared, a jury would
not be permitted to find otherwise.    In other words,
the mere fact of publication without regard to time
or circumstances, or connection with any event, is made
a violation of the statute.    Has the legislature a right
to do this?    Its power to prohibit such publications
rests upon a duty to protect the public against the in-
jurious results that may follow.    Therefore, when it
prohibits publications that have no harmful public
tendency, it exceeds its constitutional authority.    It
is our judgment that its wholesale prohibition of pub-
lications concerning bets and wagers unrelated in time
to any race, game or contest, is an unreasonable ex-

ercise of police power, and is therefore beyond the constitutional authority of the legislature.

A further objection to the validity of section 4 of the statute is that it makes a violation of mere possession of evidence of betting odds and wagers. If it be true that the language of the statute can be so construed, we would have no question as to its invalidity. We think, however, that a reasonable construction shows that the legislature intended a violation should consist of not mere possession, but of possession with intent to publish, for it says, "And the possession of evidence for the publication * * * shall in the same manner be deemed a violation of the act whether before or after the act evidenced thereby." Under this construction mere possession does not constitute a violation. Possession with an intention to publish is a violation, but, for the reasons heretofore stated, the possession must be before the event.

The complaint against the Union News Company presents a question not involved in the other cases. This company is a foreign corporation. It sells and distributes in Michigan and elsewhere a daily newspaper called the New York Times. The contention is that section 4 of the statute in prohibiting the circulation and distribution of a foreign newspaper in this State is an illegal interference with interstate commerce. There would be merit in this contention if the statute prohibited or interfered in any way with the shipment of foreign newspapers into this State in their original package. While in the original package they are objects of interstate commerce and are not subject to the police power of the State. When, however, the original package is broken and the newspapers are offered for sale or distribution, they become commingled with the goods of the State and are subject to its police regulation.

"Imported articles lose their interstate character and become subject to State regulation when they no longer remain in the original package.    This happens when the package is broken, especially where the larger receptacle is broken for the purpose of selling and delivering the smaller units, or where the property is otherwise mingled with the mass of property of the State."    12 C. J. p. 32, § 29, and cases cited in the notes.

The statute does not authorize interference with goods which are the subject of interstate commerce.    It aims only at the distribution of prohibited publications to the public within this State; and the complaint against the Union News Company does not charge anything beyond that.    The objection that the statute is an unlawful interference with interstate commerce is without merit.

Much has been written in the briefs for the defendant touching the necessity for the prohibition of the publication of such articles as are here complained of to protect the public welfare.    The arguments go to the wisdom and expediency of the legislation.    With that we are not concerned.    In respect to that matter the legislature is constitutionally supreme.    It is true that the legislature is not exclusively the judge of what is necessary to protect the health, morals and welfare of the citizens.    But, concerning those matters, it inherently must have a very large discretion.    If the matter is a proper subject of legislation and the measures adopted are appropriately related to the object and have some obvious tendency to accomplish it, the courts will not interfere.    Its wisdom may be open to question, but its enactment cannot be said to be beyond the constitutional authority of the legislature; and that is the only question which this court may determine.

Applying the general principles which we have here endeavored to formulate, to the provisions of section 4 of this statute, it is our judgment that the portion

which prohibits the publication of betting odds, etc., after the event, is an unreasonable exercise of police power, and is therefore unconstitutional.    In respect to the other provisions the legislature appears to have acted under its constitutional authority, and they must be held to be valid.

Except in the case of the Detroit Times, where the publication was after the event, the defendant should have signed and issued the warrants.    The writ of mandamus will issue if necessary to compel the issuance of warrants against the Evening News Association, The Detroit Free Press, and the Union News Company.    No costs are allowed.

BIRD, C. J., and SHARPE, SNOW, STEERE, FELLOWS, WIEST, and CLARK, JJ., concurred.