ARMSTRONG RACING PUBLICATIONS et al., Plaintiffs, *v.* PAUL MOSS, Individually and as Commissioner of Licenses of the City of New York, Defendant.

KEM KLING, Plaintiff, *v.* PAUL MOSS, Individually and as Commissioner of Licenses of the City of New York, Defendant.

TRIANGLE PUBLICATIONS, INC., et al., Plaintiffs, *v.* PAUL MOSS, Individually and as Commissioner of Licenses of the City of New York, Defendant.

Supreme Court, Special Term, New York County, June 4, 1943.

*Koenig & Bachner* for Armstrong Racing Publications and others, plaintiffs.

*William Millholland* for Kem Kling, plaintiff.

*Samuel B. Stewart, Jr.,* for Triangle Publications, Inc., and another, plaintiffs.

*Thomas D. Thacher, Corporation Counsel (Charles C. Weinstein, Bernard Friedlander* and *Raymond Horowitz* of counsel), for defendant.

SCHMUCK, J.   In spite of the length of the trial and the avalanche of exhibits, augmented by exhaustive memoranda, the problem proposed is relatively simple.   In all of these three actions two issues are presented: one of fact and one of law. To fully meet the challenge of the controversy it is necessary to decide as a fact what a " racing tip " is, and to determine as a matter of law the extent of the authority of the License Commissioner in regulating and supervising the character and

kind of publications to be sold on newsstands — to be specific — his authority to promulgate the regulation which reads as follows: " The sale of racing tips or any slips, pamphlets or published matter in connection with the number games is positively prohibited on all newsstands ".

Deferring for the moment the factual question of what is a racing tip and under what circumstances the claim of superior knowledge of the vagaries of equine competition constitutes a public menace, in order to undertake the question of the Commissioner's authority to exercise monitorial power over those who conduct their business as purveyors of news only by reason of his permission, examination of the authorities clearly indicates that this question is no longer moot or the cause for lucubration. There can be no doubt that the defendant, in his official capacity, has, despite the ministerial character of his duties, certain supervisory and regulatory powers to be exercised, particularly to safeguard public morals. Analysis of section 885 of the New York City Charter (1938), and acquaintance with *Matter of Apel* v. *Moss* (256 App. Div. 607) and *Acorn Employment Service, Inc.*, v. *Moss* (261 App. Div. 178) induce a conclusion rejecting all argument to the contrary that in the matter under consideration the Commissioner of Licenses was well within his powers in forbidding the sale of " tipster sheets " by the licensees of public newsstands.

Taking up the question of what is the rational interpretation of a " racing tip " in order to discover the propriety or impropriety of the defendant's restriction of these plaintiffs' publications, recourse must be had to the esoteric knowledge of the breeders, owners and interested followers of the " Sport of Kings " rather than to the lexicographers. It is generally agreed that the word " tip ", in its broadest sense, connotes something desirable, for it means advanced beneficial information. In a much more limited sense, when used in connection with horse racing, the word assumes an opprobrious character, for the experts, including the sports writers, whose neologistic proclivities are notorious, all agree that a " racing tip ", in its narrow sense, means the false assumption of vaticination concerning the result of a speed contest between animals justly termed thoroughbred.

But all information concerning a horse race and likelihood of one to outrace and outdistance all competitors we are warned is not necessarily a tip, for it may be based on a study of all probabilities with such certitude as to warrant its being dignified as a " selection ". At first blush it may seem that the differ-

ence between a " racing tip " and a " racing selection " is a microscopic distinction. But this exoteric disregard is strenuously repudiated by those whose opinions must be respected. After considering the distinguishing characteristics pointed out by the experts, the court agrees that a selection has nothing about it likely to mislead the unwary or justify the incrimination of debasing public morals.

After considering the criticisms of the publications of these plaintiffs, the court finds them unfounded and rejects the charge that Armstrong, Joe & Asbestos Sports Weekly, the Morning Telegraph, Daily Racing Form, Daily Racing Guide or Daily Racing Tab are " tipster sheets ". To deny that they seek public favor by the success of their predictions or selections, and that their prosperity almost wholly depends upon that success is to willfully refuse recognition of fact. There is, however, a bridgeless gulf between this and the characteristic feature of a tipster sheet. The latter is mysterious, clandestine and boastful. It is usually sealed in an envelope on which are emblazoned false representations of past infallibility.

If there is any value to the definitions and descriptions of the experts, then, in spite of the testimony of the defendant and the public officials, the publications of these plaintiffs differ from what is reputed a tipster sheet as much as day from night. The court is not unmindful of the testimony of the police that invariably when arrests for " book-making " — an euphemistic term for the illegal practice of taking wagers on a horse race — were made, copies of one, several or all the publications of these plaintiffs were found in the possession of the ones arrested. Although such a situation seems to have had a determining influence in other jurisdictions (*Plotnick* v. *Pennsylvania Public Utility Comm.*, 143 Pa. Super. Ct. 550; *Pennsylvania Publications, Inc.* v. *Pennsylvania Public Utility Comm.*, 152 Pa. Super. Ct. 279), this court fails to find this fact even circumstantially relevant to the question of abetting illegal gambling. In the light of the custom, usage, ethics and psychology of our community, it seems fairer to measure these publications in the same way as similar information in the general newspapers of the community is considered.

In consequence, the removal of these publications from public newsstands is deemed discriminatory and a capricious and arbitrary application of the rule or regulation which lay, so far as this kind of publication disseminating special information is concerned, in a state of innocuous desuetude from the date of its promulgation in 1938 until its recent enforcement.

If these publications, call them periodicals, trade journals or otherwise, are an aid to book-makers, then the same charge must hold good against the daily newssheets, particularly the *Herald Tribune*, the *Sun* and the *Evening World Telegram*, which print fully and completely the entries, post positions, probable odds, names of jockeys and consensus of opinion of reasonably successful handicappers. This sort of information loses none of its power to aid the making and regulating of wagers because it may be found in conjunction with the usual and more general news entirely disassociated with sporting events. Needless to state, no public official would even think of prohibiting the sale of any of these dailies because in many instances they are found in poolrooms and in the possession of book-makers with the racing page well-thumbed.

Therefore, from the evidence produced, it is held that the plaintiffs, in their respective actions, have established that the defendant was over zealous and arbitrarily Zoilean in his treatment of their publications.

Judgment for plaintiffs.

The findings of fact and conclusions of law submitted are too prolix and not sufficiently in accord with this determination. They are, therefore, rejected and counsel are advised to settle new findings more consonant with this decision.

No costs.