JAMES ALBERT DUNN, Doing Business Under the Fictitious Name of NEVADA PUBLISHING COMPANY, Appellant, *v.* NEVADA TAX COMMISSION, Respondent.

No. 3591

March 15, 1950.

216 P.2d 985.

*Louis V. Skinner,* of Reno, for Appellant.

*Alan Bible,* Attorney General, *W. T. Mathews,* Special Assistant Attorney General, *Geo. P. Annand* and *Robert L. McDonald,* Deputy Attorneys General for Respondent.

## OPINION

By the Court, BADT, J.:

This case and No. 3592 (Cohen v. Nevada Tax Comm., 67 Nev. 199, 216 P.2d 998), in which Frank Cohen doing business under the fictitious name of Oner Publishing Company appeals from an adverse judgment in favor of the same respondent, are in all respects identical with reference to the points of law raised. Accordingly the opinion and order in this case likewise dispose of the appeal in No. 3592.

The sole issue determined by the district court and the sole issue presented in this appeal is that of the constitutionality of chapter 152 of the Nevada Statutes

of 1949, page 326, entitled: "An Act regulating and providing for the licensing of the supplying and dissemination of horse racing information; defining the powers and duties of the Nevada tax commission with reference thereto; authorizing and empowering the Nevada tax commission to fix the rates charged for the dissemination of such information; providing penalties for violation thereof; and other matters properly relating thereto."[1] This act was approved March 26, 1949. Chapter 93 added to the gambling games licensed by the gambling act of 1931. (Faro, monte, roulette, keno, fan-tan, twenty-one, black jack, seven-and-a-half, big injun, klondyke, craps, etc.) the operation of "any race horse

[1]"Section 1. It shall be unlawful for any person, firm, corporation, or association in this state to supply or disseminate in this state by any means information received from any source outside of this state concerning horse racing when such information is to be used by the user for the purpose of maintaining and operating any gambling game and particularly any horse race book, without first having obtained a license so to do as in this act provided. The provisions of this section shall not be construed to include in its operation any public utility operating in the State of Nevada.

"Sec. 2. The Nevada tax commission shall have the power and jurisdiction to regulate and control the business of supplying and disseminating information by such means concerning horse racing, and to issue licenses to such disseminators, and to suspend or revoke such licenses, in accordance with reasonable rules and regulations to be made and promulgated by the tax commission, and the Nevada tax commission hereby is empowered to make such rules and regulations, as may be necessary for the orderly administration of this act and for the protection of the public and in the public interest.

"Sec. 3. Any disseminator of such information obtaining a license under this act shall pay to the Nevada tax commission the sum of ten dollars ($10) per day for each and every day for each and every horse race book to which such supplier or disseminator shall furnish such information in this state. The Nevada tax commission shall cause all moneys so paid to it to be deposited in the general fund of the state.

"Sec. 4. Any disseminator of such information obtaining a license under this act hereby is required to furnish such information to any licensed race horse book or sports pool operator applying to such disseminator therefor, and the same shall be furnished by such disseminator as adequately and efficiently as the same is furnished to any and all other users of such information furnished by such disseminator.

"Sec. 5. The Nevada tax commission shall have the power and

book or sports pool; or * * * any information service the primary purpose of which is to aid the placing or making of wagers on events of any kind."

Prior to this the legislature in 1945, Stats. 1945, chap. 248, p. 492, had amended the gambling act of 1931 to require a state gambling license in addition to the former county gambling license, and also added to the fixed fee for each particular type of game a license fee amounting to 1 percent "of all the gross revenue of such applicant exceeding three thousand dollars ($3,000) quarterly." In 1947, Stats. 1947, chap. 223, p. 734, further amendments were made including an increase in the license fee from 1 percent to 2 percent of the gross revenue.[2]

---

jurisdiction to fix, regulate and control the rates to be charged by any disseminator of such information; provided, however, that such rates shall be just and reasonable. It shall be unlawful for any disseminator of such information to increase directly or indirectly the rate charged by such disseminator to any user of such information in excess of the rate charged by it to such users as of March 1, 1948, without first applying to the Nevada tax commission for permission to increase such rate. In no event shall the Nevada tax commission allow any rate increase for the purpose of including in such rate charged to the user of such information the license fee herein required to be paid by such disseminator. In the event of any such application to increase the rate to be charged the Nevada tax commission shall give notice thereof to the user or users of such information concerned and to all persons interested and shall consider the application at a public hearing. If the rate or rates charged by the disseminator are found by the Nevada tax commission to be unjust or unreasonable the Nevada tax commission hereby is empowered to reduce the same to a reasonable and just rate. Any user of such information may apply to the Nevada tax commission for a reduction in the rate charged to such user and the Nevada tax commission likewise may consider such application at a public hearing after notice thereof to the disseminator and to all persons interested.

"Sec. 6. If any provision of this act or the application thereof to any person or circumstance shall be held invalid, such invalidity shall not affect the provisions or application of this act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

"Sec. 7. Any person or firm, association or corporation, or any of their officers or agents, violating any of the provisions of this act shall be guilty of a felony, and upon conviction thereof shall be punished by a fine of $5,000 and/or imprisonment in the state penitentiary for a term not to exceed five years."

[2]The act of 1945, creating a license tax of 1 percent of the gross

We should mention at this time, although further discussion is reserved to a later part of this opinion, that the legislature of 1949 also passed an act to regulate horse racing in Nevada, establishing a racing commission, etc., and repealing the prior act of 1915, covering this subject matter. Stats. 1949, chap. 195, p. 416. The same legislature passed an act regulating pari-mutuel betting and prohibiting certain other forms of betting and repealing former acts in conflict. Stats.1949, chap. 231, p. 507. This parade of gambling legislation and additional gambling acts hereinafter referred to is necessary in order to understand and to dispose of the present attack on chapter 152 of the 1949 session quoted in full in the margin.

Appellant, following a preliminary discussion of chapter 152 as a penal statute subject to strict construction and a discussion of the nature of appellant's business as a disseminator in this state of horse racing information received from a source outside of this state to users in this state, including horse racing books, and as such coming clearly within the purview of the act, attacks the latter on the following grounds:

(1) That it is arbitrary, oppressive and capricious, beyond the power of the legislature to impose, and denies due process in violation of section 1 of the fourteenth amendment to the Constitution of the United States.

(2) That it is a restraint of liberty of the press in violation of article 1 of section 9 of the state constitution.

revenue, became a law March 28, 1945, without the governor's signature. Governor Carville's letter returning this act to the legislature, thus permitting it to become a law without his signature by reason of lapse of time, explained that this type of taxation was a departure from the fixed past policy of the state even though the tax was supported by the argument "that the gambling business is in an entirely different category from what we may, for the mere sake of differentiation, term legitimate business." Letter printed in Stats.1945, p. 495. Fourteen years before that in State ex rel. Grimes v. Board of Commissioners, 53 Nev. 364, 1 P.2d 570, this court had fixed the category of the gambling business, not "for the mere sake of differentiation" from legitimate business, as definitely having deleterious tendencies.

(3) That it is a law of special and nonuniform operation in violation of section 21 of article IV of the state constitution.

(4) That it is a regulation of interstate commerce in violation of section 8 of article I of the federal Constitution.

Before discussing these four grounds of attack the nature of the business regulated must be understood. Respondent's brief contains "an outline of furnishing wire service." Appellant does not appear to question the accuracy of this outline, but recites the legislative history of chapter 152 from its first introduction on March 14, 1949 to its approval by the governor March 26, 1949 as disclosed by the legislative journals, and insists that the record is thus "devoid of any evidence, in the form of investigation, committee hearings, committee reports or otherwise that material such as that presented" in respondent's brief was presented to or considered by the legislature in enacting the legislation. It would however be folly for this court to plead judicial ignorance of the situation. We might go further and even recognize the nomenclature used in the business. Thus we have the "run-down" or "work sheet," the "scratch sheet," the "call," the "bookies," the "morning line," "hang on," "lay-off," "off-time," "post-time," "service spot," "drops," etc. If these expressions seem strange[3] outside of a state that permits all types of gambling, including the placing of bets through the "horse race books" on race meets in all the big tracks of the country, they are perhaps no more strange than terms used by the psychiatrists in insanity-defense murder cases that come before us for review, nor than the nomenclature used by those circles who are reframing for the nation the purposes and methods of public school education. Yet

[3]For recognition of the meaning of these terms "recourse must be had to the esoteric knowledge of the breeders, owners and interested followers of the 'Sport of Kings' rather than to the lexicographers." Schmuck, J., in Armstrong Racing Publications v. Moss, 181 Misc. 966, 43 N.Y.S.2d 171, 173.

what person of general knowledge and reading may plead ignorance of the latter? And so we feel entirely justified in accepting respondent's outline of the industry which this legislation seeks to regulate and control. It is as follows:

"For a number of years certain firms and associations have engaged in a business within the State of Nevada known as 'furnishing wire service' to those engaged in horse race book-making in gambling establishments. The method of carrying on such business is substantially as follows:

"One large association or corporation is the source of all racing news furnished to gambling establishments within the United States. This organization maintains at all the principal tracks of the country, representatives who gather the necessary news regarding the races. The representative, prior to the race, secures such information as the names of the horses entered, their jockeys, owners, trainers, weights carried, and any horses that have been 'scratched' or withdrawn from the race. This information is then sent over a teletype service of the Western Union to franchise holders at various points throughout the United States. In Las Vegas and in Reno, certain parties hold franchises, which confer upon such parties the right to receive such news. This teletype news is received by each of the persons or associations holding a franchise in a central news dispensing room. At this central point is maintained a receiving teletype machine and a microphone connected with wires to all gambling establishments within the particular city receiving the so-called wire service. The information received by teletype is by the franchise holder then broadcast over the wires to the various gambling halls receiving such service. The information broadcast through the microphone can be supplied to all the gambling establishments in a particular city at one time or one or more can be cut off from the source of news by the man operating the microphone at any particular time. A gambling establishment desiring to receive the

service applies to the person holding the franchise within the city and this person or association either grants or refuses such services. If he agrees to furnish the services, he enters into an agreement by which the franchise holder will receive a flat weekly sum as rental or in some instances, a percentage of the gross or net returns from the horse racing book of the particular gambling establishment. The franchise holder in some gambling establishments operates the book itself. If service is granted to a particular establishment there is installed either by or at the direction of the franchise holder a wire to the particular gambling house and a loud speaker therein. This wire is in turn hooked in with the central news distribution room of the franchise holder and to the microphone that has been heretofore mentioned. The representative of the news gatherer at the track, in addition to transmitting the information heretofore mentioned, gives almost instantaneous news of the race itself and the events leading up to and following it, which are of interest to bettors. Just prior to the race he gives the estimated odds as shown at the track, the condition of the track, etc. At the beginning of the race he transmits a description of the race as the horses reach the post, their progress during the race, the final winners and the odds payable on the pari-mutuel machines at the track on the particular winner or winners. All this information is sent out in a series of teletype messages. It is received in the central rooms of the various franchise holders as mentioned above. A man is there maintained who speaks into the microphone and relays the same information received over the teletype to the various gambling establishments, who have contracted for the service. The gambling establishments maintain boards in their gambling rooms, which show the races being held at the various tracks throughout the United States and part of the information received over the microphone. The patrons of the gambling house bet on particular horses the same as they would at the tracks and ordinarily receive the tracks' odds if they win. The

news that comes into the gambling establishment from over the microphone gives the patrons of the gambling house, almost instantly, information of the beginning of the race, the progress thereof, the winners and the odds payable. The service has become an integral part of horse race wagering in gambling establishments throughout the country."

This general situation, or at least a substantial part of it, is not a complete stranger to the law reports. See Pennsylvania Publications, Inc. v. Pennsylvania Public Utility Commission, 349 Pa. 184, 36 A.2d 777, 153 A.L.R. 457, and annotation "Background of Wire Service Problem," 153 A.L.R. 463; also People v. Brophy, 49 Cal.App.2d 15, 120 P.2d 946, and Albright v. Muncrief, 206 Ark. 319, 176 S.W.2d 426. And to it we may add the undisputed fact that the furnishing of the wire information to the local books is essential to their maintaining of the gambling game of race horse books.

(1) In his contention that the act is arbitrary, oppressive and capricious and beyond the power of the legislature to impose and that it denies due process in violation of section 1 of the fourteenth amendment to the federal Constitution, appellant properly characterizes the legislation as an exercise of the police power and that as such it must be reasonably exercised for the public welfare and that the measures provided for accomplishing the objective must have a relation to the purpose sought to be accomplished. Reliance is then placed on Parkes v. Bartlett, 236 Mich. 460, 210 N.W. 492, 494, 47 A.L.R. 1128, 1129, involving the validity of a statute prohibiting publications concerning, among other things, bets and wagers on races. Appellant quotes from this case as follows:

" 'The police power of the state extends only to such measures as are reasonable, and the general rule is that all police regulations must be reasonable under all circumstances.' * * *

" 'By the term "reasonable" is not meant expedient, nor that the conditions must be such as the court would

impose if it were called on to prescribe what would be the conditions. They are to be deemed reasonable where, although perhaps not the wisest and best that might be adopted, they are fit and appropriate to the end in view, to wit, the protection of the public, and are manifestly adopted in good faith for that purpose. If the condition should be clearly arbitrary and capricious; if no reason with reference to the end in view could be assigned for it; and especially if it appeared that it must have been adopted for some other purpose, such for instance, as to favor or benefit some person or class of persons, it certainly would not be reasonable, and would be beyond the power of the Legislature to impose.'

"State v. Vandersluis, 42 Minn. 129, 43 N.W. 789, 6 L.R.A. 119, cited in 7 Words and Phrases, First Series, page 5953."

Appellant calls attention to the fact that the court held the statute was a reasonable restraint under the police power insofar as it affected the publication of information in regard to future gambling events and invalid insofar as it affected the publication of information concerning past events, and particularly to that part of the above excerpt to the effect that if the legislation appeared to have been adopted for the purpose of favoring or benefiting some persons or class of persons it would be beyond the power of the legislature to impose. All of this is good law, subject to the observation that it cannot be said that *any part* of the race horse wire service here under contemplation can be considered so innocuous that the legislature must perforce remove it from the operation of the regulatory and licensing provisions. In this regard it should be noted that the plaintiff in order to bring himself within the provisions of the act, thus establishing himself as a person with such interest as to question its validity, alleged that under the fictitious name of Nevada Publishing Company he was engaged in conducting a large, extensive and profitable business consisting of the supplying and dissemination within the State of Nevada for use in the

maintenance and operation of gambling games, sports pools and horse race books, and for other purposes, of horse racing information received from sources outside said state; and that in the course of said business he services "board rooms" maintained by the larger gambling houses, "commission bettors" who operate on a limited scale for their own account and the account of others, newspapers of general circulation and radio stations. And in his briefs, expressing full agreement that he is subject to the provisions of chapter 93 containing the amendments to the gambling act of 1931, he further concedes the fact of his operation of his information service, "the primary purpose of which is to aid the placing or making of wagers on events of any kind."

The contention that the purpose of the act is to favor or benefit the race track books and not "for the protection of the public and in the public interest" as recited in section 2 of the act is not tenable. We concede that the recital in the act itself that it is for the public interest is persuasive only, and not controlling, State v. Harris, 216 N.C. 746, 6 S.E.2d 854, 128 A.L.R. 658, but the public protection and interest are manifest. Neither the purpose of the information as recited in the act, nor the measurement of the license fee of $10 per day per book served (without including other users of the service), nor the mandatory nature of the requirement to furnish the service on equal terms to all licensed race horse books or sports pool operators, nor the regulation of the rates to be charged to the users of the service as defined in section 1, nor the prohibition against passing the tax on to the "books," nor the combination of these circumstances, support appellant's contention that the purpose of the act is to benefit the race track books and is not for the protection of the public or in the public interest. Measuring sticks or criteria for the regulation of ordinary businesses and professions can simply not be applied to the race horse book situation. The adjuncts, the ramifications, the influences, the results,

the burdens cast on the taxing and law enforcement agencies are so wide and of such impact on the society and economic life of the state as to suggest the necessity of drastic means of regulation and control. We are unimpressed with the argument that the regulation or the prohibition against passing on to the books the tax against the dissemination of race track news does not inure to the benefit of the public; that the public bears no part of the cost of the service; that the betting is strictly a matter between the public and the bookmaker independently of the information service; that the bookmaker may subscribe to the service or not as he sees fit, etc. Without the information service the race horse books could not operate; without the fees paid by the race horse books the information service could not operate; without the combined operation this kind of race horse betting would be reduced to a minimum. The question of the continuance or the cutting off of the legislative sanction of this as well as other type of gambling has its impact on virtually every citizen and every sojourner within the state.

◼ From the foregoing it is apparent that appellant can draw no support from the contention that he is not engaged in the gambling business and therefore not within the rule of State ex rel. Grimes v. Board of Commissioners, 53 Nev. 364, 1 P.2d 570, or that due process has been violated by the act or the police power unreasonably applied. Norman v. City of Las Vegas, 64 Nev. 38, 177 P.2d 442.

It is not difficult to understand why no authorities directly in point have been presented. Statutes prohibiting the dissemination of race track news to facilitate betting are discussed elsewhere. In Nevada alone, where professional gambling is licensed, do we find a statute regulating this business or profession. Appellant suggests however that cases dealing with newspapers as public utilities are helpful. These cases are apparently cited in support of the contention that rates may be regulated by the state only in the case of public utilities.

In this regard appellant quotes as follows the annotation from Shuck v. Carroll Daily Herald, 215 Iowa 1276, 247 N.W. 813, 87 A.L.R. 975, appearing at page 979 of the A.L.R. citation: "With the exception of one case, * * * it has been uniformly held in the few cases which have considered the question that the business of publishing a newspaper is a strictly private enterprise, as distinguished from a business affected with public interest, and that its publisher is under no legal obligation to sell advertising to all who may apply for it."

Thus in Chronicle & Gazette Pub. Co. v. Attorney General, 94 N.H. 148, 48 A.2d 478, 168 A.L.R. 879, a statute prohibiting a newspaper or radio station from charging higher rates for political advertising than for commercial advertising was sustained against the attack that it abridged the freedom of the press. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, was distinguished as treating a license tax imposed by statute on newspapers. Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, was distinguished as involving an attempt to suppress or censor newspapers. The New Hampshire statute was held not to exercise any previous restraint on publication of news. Conceding that the newspaper was not a public utility generally subject to regulation of its rates or compelled to accept political advertising, the court then said: "But it does not follow that because newspapers are not public utilities that they are immune from regulation. Newspapers, like other businesses, are subject to the police power." [94 N.H. 148, 48 A.2d 482.] The court then called attention to Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, as considerably impairing the old doctrine (Ribnik v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327) that a business was not subject to regulation unless affected with a public interest, and also to Olsen v. State of Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500, as discarding such

theory, to the final conclusion that the regulation of newspapers is as broad as that over other private business. The conclusion reached by appellant from analogy of the newspaper cases is that appellant, not being a public utility, is not subject to general regulation of his rates and cannot be compelled to furnish service to all licensed applicants. This again runs afoul of State ex rel. Grimes v. Board of Com'rs., 53 Nev. 364, 1 P.2d 570, which, as we have seen, distinguishes gambling from useful trades, occupations and business and makes it subject to a proper exercise of the police power and subject to regulation or suppression—this by reason of its deleterious tendency.

Nor is appellant helped in this regard by his citation of Michigan Public Utilities Commission v. Duke, 226 U.S. 570, 45 S.Ct. 191, 69 L.Ed. 445, 36 A.L.R. 1105, to the purport that the legislature may not by its own fiat make a particular business a public utility, which in fact it is not, consistently with the due process clause of the federal Constitution. This we concede, particularly with reference to the facts of that case in which the state sought to impose the duties of a common carrier upon one engaged in transporting merchandise for a single manufacturer from his plant to a destination in another state, thus preventing him from using his equipment exclusively to perform his contracts. The court also held that the statute violated other constitutional limitations. In short the newspaper cases afford scant assistance.

██ It is also contended that due process is violated because the act is not sufficiently explicit and therefore faulty under our holding in Ex parte Smith, 33 Nev. 466, 111 P. 930. In our opinion the act is sufficiently explicit in describing the persons subject to its provisions in providing what may and what may not be done under its provisions, and the penalties for violation. Nor is the requirement for adequate and efficient service to all race track book operators applying for same in

like manner as furnished to other users irrespective of the geographical scope involved in the service so indefinite, uncertain or discriminatory as to violate due process. The state tax commission, under its power to make rules and regulations, may well "fill in the gaps." 16 C.J.S., Constitutional Law, sec. 138, cases cited in note 17 from virtually every state in the Union. Appellant relies on Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 568, 76 L.Ed. 1062, 86 A.L.R. 403, as holding, as indeed it did, that general provisions making unlawful a waste of petroleum pumped from wells were too indefinite to support provisions for a penalty for their violation. They were said by the court to be "no more definite than would be a mere command that wells shall not be operated in any way that is detrimental to the public interest in respect of the production of crude oil." We find no such situation here. On the other hand the opinion, written by Mr. Justice Butler for a unanimous court, upholds in all other respects the Oklahoma statute prohibiting the production of petroleum in such manner as to constitute waste, etc., as against the attack that it was repugnant to the due process and equal protection clauses of the fourteenth amendment. It held also that the commerce clause was not violated by the statute even though the petroleum affected was intended to be and was in fact immediately shipped in interstate commerce. The act was likewise held not to be unreasonable or arbitrary nor was the vagueness of the penal provisions permitted to taint the constitutionality of the rest of the act. The Oklahoma act and Mr. Justice Butler's opinion and the applicability thereof to the present case are of such extent as to preclude detailed discussion here. Suffice it to say that the principles enunciated are in no degree in conflict with our own views as here enunciated.

In Lincoln Federal Labor Union No. 19129, A. F. of L., v. Northwestern I. & M. Co., 335 U.S. 525, 69 S.Ct. 251, 257, 6 A.L.R. 2d 473, the supreme court of the United States, referring to its rejection in Nebbia v. People of

State of New York, supra, of the old doctrine theretofore held, distinguishing between businesses according to whether they were or were not "clothed with a public interest," emphasized the fact that that court had "consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition (and that) the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare." See also Commonwealth v. Zasloff, 338 Pa. 457, 13 A.2d 67, 128 L.R.A. 1120.

■ (2) It is next contended that the act is a restraint of liberty of the press in violation of article I, section 9 of the constitution of Nevada. In support of this contention reliance is first placed upon City of Reno v. Second Judicial District Court, 59 Nev. 416, 95 P.2d 994, 125 A.L.R. 948, which properly declared that freedom of the press may not be suppressed under the guise of regulation and is not subject to the exercise of arbitrary power. In that case this court struck down an ordinance of the city of Reno which did not pretend to regulate but absolutely prohibited all picketing, whether peaceful or otherwise. After referring to sundry cases holding the dissemination of information by peaceful picketing to be analogous to the use of the press, etc., this court held that it could not be subject to such arbitrary prohibition. That case does not in any way shed any light on the present problem. But appellant relies more strongly on Parkes v. Bartlett, 236 Mich. 460, 210 N.W. 492, 494, 47 A.L.R. 1128, in which the supreme court of the state of Michigan sustained that part of the statute which related to publication of race news before the racing event, but held the statute invalid insofar as it related to publications after the event. The statute made

it unlawful for any person to publish information concerning the making of bets or the selling of pools or evidences of betting odds on any race, etc., "when committed after any * * * race * * * as well as when committed before any such * * * race." Pub. Acts 1925, No. 176, sec. 4. It is interesting to note however that the court said: "It is apparent that every publication before the event would naturally have a tendency to encourage gambling. It is made of a particular pending event at which there would be an opportunity to gamble. This is not true of *every* publication after the event. *Some undoubtedly would have a harmful tendency;* some would not. Everyone can conceive of many publications after the event that could have no possible tendency to induce gambling." (Italics supplied.) We think the matter well put by the Michigan court. But when fitted to the pattern of appellant's business as outlined in this opinion, it affords complete justification for the act here attacked. Appellant also cites Armstrong Racing Publication v. Moss, 181 Misc. 966, 43 N.Y.S.2d 171, 173. This case is very much in the same category as Parkes v. Bartlett, for here the supreme court, of New York County (it does not appear that the case was ever considered by either the appellate division or the court of appeals), held that the commissioner of licenses "was well within his powers in forbidding the sale of 'tipster sheets' by the licensees of public newsstands," but rejected his order forbidding sale of other publications of racing news which were in all respects comparable to the sports pages found in the regular daily newspapers. No more are we persuaded by Commonwealth v. Certain Gaming Implements, 317 Mass. 160, 57 N.E.2d 542. We have no difficulty in finding that the legislature, without any unconstitutional restraint of the liberty of the press, had full power not only to regulate but to ban the operation of appellant's business. Howard Sports Daily v. Weller, 179 Md. 355, 18 A.2d 210, and cases therein cited.

■ (3) Appellant contends that the act is a law of

special and nonuniform operation in violation of section 21 of article IV of the Nevada constitution.[4]   In support of this contention appellant relies on State v. California Mining Co., 15 Nev. 234.   This court there said:  "* * * it has always been agreed that a law which applies only to an individual or to a number of individuals selected out of the class to which they belong, is a special and not a general law," and further accepted the definition of a special law as "one which affects only individuals and not a class—one which imposes special burdens, or confers peculiar privileges upon one or more persons in no wise distinguished from others of the same category." Support is also sought from Washoe County Water Conservation District v. Beemer, 56 Nev. 104, 45 P.2d 779, which recognizes the same principle.   In seeking to bring chapter 152 within these definitions of a special law, counsel asserts (1) that its application depends on the geographical source of the information (from outside the state as heretofore discussed) ; and (2) that it depends upon the exclusion of public utilities from its operation.   The first of these grounds is later disposed of in our rejection of the contention that the act discriminates against foreign commerce and places a burden on interstate commerce.   The second ground is likewise disposed of by our justification of drastic regulation of appellant's occupation and by our distinguishing of appellant's business from that of the press in general.   It may be noted that the contention is supported by nothing more than appellant's simple assertions.   In our opinion the statute is of general and uniform operation.   Obviously it does not operate upon every person in the state, but it does operate upon every person brought within the relation and circumstances therein described.   Young v. Hall, 9 Nev. 212.

■■   (4) Appellant contends that the act is a regulation of interstate commerce in violation of section 8 of

[4]"In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state."   The "cases enumerated in the preceding section" have no application.

article I of the Constitution of the United States, vesting in congress the power to regulate commerce among the several states. This contention is made chiefly upon the ground that the act is directed exclusively to the licensing, regulating and taxing of the dissemination of information received from a source outside of this state, and therefore discriminates against services by reason of their out of state origin. In support of this contention reliance is placed upon the so-called liquor cases.[5] These cases held generally that the particular statute attacked created a burden on interstate commerce or discriminated by imposing upon property imported from another state a greater burden of taxation than levied upon domestic property of like nature. It was thought that legislation of this nature could result in levying a tax on a foreign article so high as to exclude its introduction and prevent its competition with the home product, or would discriminate in favor of products (wines and spirits) made from grapes or fruits grown in the state and against the same products made from grapes or fruits grown elsewhere, etc.

As to the contention that the act places a burden on interstate commerce, the rule has long been recognized that statutes enacted under the police power to protect the public health, morals, safety and welfare, and which affect interstate commerce incidentally only, are not invalidated by such incidental result. In further enunciation of this rule statutes prohibiting the furnishing of telephone or telegraph services facilitating betting on horse races have, in well reasoned opinions, been held not to violate section 8 of article I of the federal Constitution. State v. Harbourne, 70 Conn. 484, 40 A. 179, 40 A.L.R. 607, 66 Am.St.Rep. 126; City of Louisville v. Wehmhoff, 116 Ky. 812, 76 S.W. 876, 79 S.W. 201; Logan & Bryan v. Postal Telegraph and Cable Co.,

[5]State v. Parker Distilling Co., 236 Mo. 219, 139 S.W. 453, and cases therein summarized; Darnell & Son Co. v. City of Memphis, 208 U.S. 113, 115, 28 S.Ct. 247, 52 L.Ed. 413; Welton v. State of Missouri, 91 U.S. 275, 23 L.Ed. 347; Scott v. Donald, 165 U.S. 58, 17 S.Ct. 265, 41 L.Ed. 632; Guy v. Baltimore, 100 U.S. 434, 25 L.Ed. 743; Minneapolis Brewing Co. v. McGillivray, C.C., 104 F. 258.

C.C., 157 F. 570; 24 Am.Jur. 400, Gaming and Prize Contests, sec. 5; 11 Am.Jur. 85, Commerce, sec. 94.

In State v. Harbourne, supra, the Connecticut statute prohibited the keeping of any place in which was permitted or conducted the business of transmitting money to any race track or other place to be bet on any horse within or without the state, and was attacked as an interference with interstate commerce. The court said that the statute [70 Conn. 484, 40 A. 181] "does not attempt to, and does not in fact, exercise any exclusive power vested in congress over interstate commerce. It simply prohibits in this state the business of aiding crime; and, if such commerce is thereby affected at all, it is the incidental effect of depriving those here engaged in telegraphing of the profits they might make through the business of promoting gambling in this state."

In City of Louisville v. Wehmhoff, supra, there was involved an ordinance of the city of Louisville making it unlawful for any telephone or telegraph company to furnish to any poolroom operated in the city any information to be used by such poolroom to promote betting on horse races in or out of the city. The ordinance was approved in vigorous language.

In Parkes v. Bartlett, 236 Mich. 460, 210 N.W. 492, 495, 47 A.L.R. 1128, involving an act, Pub.Acts 1925, No. 176, to suppress gambling "and to prohibit the publication and furnishing of information concerning gaming," section 4 of which made it unlawful to publish any information concerning the making of bets, the court said: "The statute does not authorize interference with goods which are the subject of interstate commerce. It aims only at the distribution of prohibited publications to the public within this state; and the complaint against the Union News Company does not charge anything beyond that. The objection that the statute is an unlawful interference with interstate commerce is without merit."

But it is further contended that the taxing and licensing provisions of chapter 152, attaching, as they

do, to the dissemination in this state of information received "from any source outside of this state," and not attaching to the dissemination of information from sources inside the state, discriminate in favor of local race horse gambling and against interstate race horse gambling. It is contended that, admitting the right of the state under its police powers to tax all race horse gambling through the dissemination of information to the bookmakers despite any incidental burden on interstate commerce, such burden becomes unconstitutional by reason of the discrimination. Many authorities are cited to support this view. Nor should we be disposed to treat the contention lightly if it found support under the facts and under the laws of this state. Horse racing in this state is confined to a few minor race meets a year, conducted almost entirely in connection with county or state fairs. The results of such races are of little or no importance to the race track world. However, be this as it may, and assuming the holding of race meets within this state in whose favor chapter 152 is said to discriminate, we cannot find that such discrimination is effected. *All betting, through any bookmakers operating by means of dissemination of information concerning such races in the state, is unlawful.* This is so by reason of chapter 231 of the Statutes of 1949, page 507, being "An Act to license and regulate the operation of parimutuel betting  *  *  *  in certain enclosures only, in Nevada;  *  *  *," section 5 of which reads as follows: "All other forms of wagering or betting on the results of any of the races or events licensed hereunder outside the enclosure where such races or events are licensed by the board are illegal." This act subjects pari-mutuel betting on Nevada race events to strict license and regulation by the Nevada tax commission, including the fingerprinting of the applicant, examination as to his antecedents, habits and character, the charging of license fees, the requirement that all pari-mutuel wagering be within the grounds, the outlawing of betting on the

results in any other manner, the limitation of the commission that may be deducted, the payment of a percentage thereof to the state, the strict inspection by the commission of the applicant's books, and provisions for suspension or revocation of the license for violation of the statute or any rule or regulation of the commission, in addition to punishment by fine or imprisonment for any violation. So, while the dissemination of out of state information to be used by local race horse books is subject to the provisions of chapter 152, such means of betting on races held within the state is made unlawful by chapter 231. The legislature was under no compulsion to cover every subdivision of the field in a single enactment. American Federation of Labor v. American Sash & Door Co., 335 U.S. 538, 69 S.Ct. 258, 6 A.L.R.2d 481.

The same session of the legislature enacted chapter 195 of the Statutes of 1949, page 416, being an act to regulate the racing of horses in the State of Nevada, etc., under the terms of which horse racing may be conducted by obtaining a permit from the state racing commission created by the act. Strict provisions are contained for the revocation and suspension of permits. The act does not apply to state or county fairs or to certain veterans' organizations, subject, however, to strict limitations. All other race meets are made unlawful and subject to a fine of not less than $500 nor more than $1,000 for each day thereof. Under the act pari-mutuel betting is permitted through application to the Nevada Tax Commission "in conformity with the gambling laws of this state and the rules and regulations of the Nevada tax commission." Accordingly race meets held in the state, under chapter 195, would be subject to the restrictions of chapter 231 outlawing all betting except at the pari-mutuel booths within the enclosure. Such chapter 195 repealed the old race track act of 1915, which had been amended several times prior to 1949.

Nevada's general gambling law of 1931, thereafter

amended a number of times, was again amended in 1947 to increase the license fee from 1 percent to 2 percent of the gross revenue. Statutes 1947, chap. 223, p. 734. Section 10ee was added generally increasing the license fees, in addition to the increased percentage fee above mentioned. Establishments operating three games paid an annual fee of $750; for four or five games $1,750; for six to seven games $3,000; for eight to ten games $6,000; for eleven to thirteen games $10,000; for fourteen to twenty games $20,000; for twenty-one or more $30,000. This is followed by the provision: "In computing the number of games operated or to be operated by an applicant hereunder, a license authorizing the receiving of bets or wagers on horse races held without the State of Nevada, as authorized and provided for under chapter 57, 1941 Statutes, page 64, shall be construed as and deemed a game within the meaning of this section."

The 1941 statute, above referred to, which was an act amending the general act concerning crimes and punishments and making it unlawful to conduct sundry games without a license contains the provision: "The receiving of bets or wagers on horse races held without the State of Nevada shall be deemed to be a gambling game within the meaning of this section * * *." It also made it unlawful to disseminate such news beyond the limits of the state.

The 1915 act regulating horse racing in the State of Nevada was amended in 1943, Statutes 1943, chap. 80, p. 105, which, among other things, raised the pari-mutuel commission from 10 percent to 12 percent, which fees were required to go into the highway fund instead of the general fund as theretofore. Pari-mutuel betting was still confined to persons licensed pursuant to statute.

While we have endeavored to limit to the bare essentials our review of some of our gambling statutes down to the present time, it is evident from those referred to that race horse betting on races held within the state has been strictly limited to betting in the pari-mutuels within the enclosures where the races were held. Outside books on such local betting have been and still are

unlawful, but, as we have seen, the handling of bets on races held outside the state has simply been licensed and taxed in like manner as the conducting of a gambling game. The act of 1949 here under attack as discriminatory against dissemination of interstate racing news simply placed this activity under the control of the state tax commission, assessed a tax of $10 per day per horse race book to which the disseminator furnished service, required the disseminator to furnish service to all books applying for same, made the disseminator's rates subject to approval by the commission, and prevented the disseminator from passing his tax on to the books, etc. It left in effect against the gambling operators fees running, as we have seen, as high as about $1,500 per game per year, as well as the fee of 2 percent of gross revenue.

In the plan thus developed by the legislature we find nothing so unreasonable, arbitrary, capricious or discriminatory or so devoid of a real and substantial relation to the regulation sought to be accomplished as to invalidate the legislation on any of the grounds asserted. Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. That the legislation was in the proper exercise of the police power we have no doubt. Nor are the revenue sections unrelated to such exercise of the police power, nor do they defeat such exercise. Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293. All the ingenuity of the lawmakers was required in order to license, regulate and tax an industry of deleterious tendency, which apparently had theretofore escaped such taxation and regulation. The legislature apparently thought it best to insure that the disseminators of out of state race news should pay the tax of $10 per day per book served, out of their own revenues from such service and without passing it on to the horse race books. So long as the methods used for taxation and regulation do not exceed any constitutional limitations, it is not our province to try to discover whether or not some better method might have

been devised. No matter how drastic the regulations appear to be, this would not authorize us to substitute our own judgment for that of the legislature if such regulations appear reasonably intended to achieve the results sought. Premier-Pabst Sales Co. v. State Board of Equalization, D.C., 13 F.Supp. 90, 96.

We have carefully considered all of the authorities submitted by appellant, some of which we have not found it necessary to discuss. We have likewise given due consideration to all points raised in appellant's briefs, but do not find further discussion necessary. It is our opinion that no limitations imposed by either the federal or state Constitution are violated by any of the provisions of the act attacked in these proceedings.

The case was presented to the district court on a complaint seeking to enjoin the enforcement of the regulations and to obtain a declaratory judgment as to the validity of the act. No question is raised as to the sufficiency of the complaint to entitle the plaintiff to seek relief under the declaratory judgment act.

The judgment is hereby affirmed with costs.

The record indicates that during the course of the proceedings in the district court, orders were made permitting the impounding in that court of the accruing license fees required by the act and that such orders were continued in effect pending this appeal. The district court is directed to make all necessary and proper orders in the premises so that the impounded funds may be paid forthwith to the proper officials for deposit in the general fund of the state in accordance with the provisions of chapter 152 of the Statutes of 1949, page 326, and to vacate any subsisting orders purporting otherwise to permit the further impounding of such fees.

HORSEY, C. J., and EATHER, J., concur.